Michael CROWE, et al., Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al., Defendants.

And Related Actions

No. 99CV0241 R (RBB).

United States District Court, S.D. California.

Feb. 28, 2005.

Milton J. Silverman, JR., Law Offices of Milton Silverman, Robert J. Francavilla, Casey Gerry Reed and Schenk, Dennis A. Schoville, Schoville and Arnell, San Diego, CA, for Plaintiffs.

Guylyn Remmenga Cummins, Sheppard Mullin Richter and Hampton, San Diego, CA, for Intervenor.

Deborah Lynn Nash, George W. Brewster, JR., County of San Diego Office of County Counsel, Kenneth H. Moreno, Murchison and Cumming, Luther W. Horton, Horton and Ryan, San Diego, CA, Diana L. Field, Ferguson Praet and Sherman, Santa Ana, CA, Mark A. Waggoner, City of Escondido Office of the City Attorney, Escondido, CA, Richard J. Schneider, Daley and Heft, Solana Beach, CA, Hugh G. Radigan, Koester and Walker, Glendale, CA, for Defendants.

## ORDER RE: SUMMARY JUDGMENT MOTIONS

RHOADES, District Judge.

### INTRODUCTION

The tragic facts of this case arise out of the murder of young Stephanie Crowe in her home on the evening of January 20, 1998, and the ensuing investigation. Stephanie's murder was investigated by members of the Escondido Police Department, including defendants Mark Wrisley, Ralph Claytor, Barry Sweeney, and Phil Anderson (collectively, "defendants"), who bring the present motions for summary judgment. The investigation of Stephanie's death initially led to the arrest and indictment of Stephanie's brother, Michael Crowe, and his two friends, Joshua Treadway and Aaron Houser (collectively, "the boys"), all juveniles at the time. Prior to the boys' trial, evidence was discovered which resulted in the District Attorney dropping the charges against the boys without prejudice. The boys and their families then brought this civil action for damages for violation of their federal constitutional rights pursuant to 42 U.S.C. § 1983 as well as for violation of state law. This court previously entered summary judgment on many of plaintiffs' claims. *See Crowe v. County of San Diego,* 303 F.Supp.2d 1050 (S.D.Cal.2004). Subsequent to the entry of that order, Richard Tuite was convicted of Stephanie's murder. This court is now confronted with a second round of motions for summary judgment filed by defendants Wrisley, Claytor,

Sweeney and Anderson as to claims brought by Michael, his sister, Shannon, his parents, Cheryl and Stephen Crowe, and his grandmother, Judith Kennedy (collectively, "plaintiffs").

## FACTUAL BACKGROUND

To provide context to this order, the court provides a brief account of the relevant facts. A more thorough presentation of the relevant factual background can be found in *Crowe*, 303 F.Supp.2d at 1058–1062.

On the night of January 20, 1998, the police received phone calls that Tuite, a transient, was bothering people in the vicinity of the Crowe residence. Tuite appeared drunk or high. One witness heard Tuite yell "I'm going to kill you you fucking bitch." Another witness saw Tuite spinning around in circles.

Between 7:00 and 8:00 p.m. that night, Tuite entered one house after the occupant, Dannette Mogelinski, mistaking his knock for that of a neighbor, invited him in. Tuite repeatedly asked for Tracy. Mogelinski said she did not know Tracy. Tuite left but then opened the door and again asked for Tracy. Mogelinski again said she did not know Tracy, and Tuite left.

Around 9:28 p.m., Gary West, a neighbor of the Crowes, called police to report a transient who had knocked on his door and said he was looking for a girl. Escondido police officer Scott Walters, not a defendant in this action, was dispatched to the area. While investigating this call, Officer Walters drove up to the Crowe house. As he drove up, the door next to the garage door closed. He couldn't see who closed it. Officer Walters left the Crowe house and indicated in his log that the transient was "gone on arrival."

Stephanie was found dead by Judith Kennedy around 6:30 a.m. on January 21, 1998. An autopsy determined that Stephanie was stabbed numerous times with a knife with a 5–6 inch blade. Police questioned all of the members of the Crowe household on January 21, 1998. Michael was questioned several times.

On January 22, 1998, Escondido Police Detectives Lanigan and Naranjo, not defendants in this case, went to the Treadway residence to speak with Joshua. The detectives saw a knife in plain view on top of a couch in the living room.

Michael was arrested for Stephanie's murder on January 23, 1998.

On January 26, 1998 Detective Han obtained a search warrant for the Treadway residence. Probable cause for the warrant was predicated upon the fact that Michael had been arrested for the murder, Michael had stated that Joshua was his best friend, Michael had called Joshua from the police station on the morning of the murder, and a knife meeting the description of the murder weapon had been seen at the Treadway residence.

On January 27, 1998, prior to the execution of the search warrant for the Treadway residence, Aaron's mother alerted police to the fact that a knife with a 4–5 inch blade which belonged to her son was missing from his collection. Based on this information, Detective Han sought and obtained a warrant to search the Houser residence. Defendants also questioned Aaron that same day.

The warrants for the Treadway and Houser residences were executed on the evening of January 27, 1998. While the warrant for the Treadway residence was being executed, Joshua was being questioned by police. During his questioning, the search of the Treadway residence revealed two knives under his bed. One had a 5½ inch blade, and the other had a 6 inch blade. Joshua was then arrested for stealing Aaron's knife. After being read his

*Miranda* rights, Joshua admitted taking the knife from Aaron, but denied any involvement in Stephanie's death. However, over the course of further questioning, Joshua changed his story. He told defendants that he had gotten the knife from Aaron and that Aaron had told him it was the knife used to kill Stephanie. Joshua was allowed to go home after the questioning.

Joshua was questioned again on February 10, 1998. This time, Joshua gave what appeared to be a detailed account of the events leading up to the murder and stated that he had acted as a lookout while Aaron and Michael committed the murder. Joshua's confession, which was ruled voluntary by the state court trial judge, suggested that Michael killed Stephanie because he did not like her. At some point during the questioning, Joshua was arrested for Stephanie's murder.[1]

On the morning of February 11, 1998, defendant Claytor obtained search warrants for Aaron's residence and school locker. Those warrants were executed on the morning of February 11 by defendants Sweeney and Anderson.

Aaron was arrested on February 11, 1998, and questioned for a second time. Aaron did not admit involvement in Stephanie's murder. However, during this questioning, Aaron explained how he would kill Stephanie if he was going to kill her.[2]

In late May 1998, the grand jury issued indictments against the boys. Prior to the boys' trial, drops of Stephanie's blood were found on Tuite's sweatshirt. The charges against the boys were dismissed without prejudice, and this action followed.

## ANALYSIS

### I. The General Law of Qualified Immunity

Because the resolution of the current motions hinges in large part on the proper application of the doctrine of qualified immunity, the court begins by setting forth the relevant law regarding the general application of that doctrine.

■ Qualified immunity is immunity from suit, not simply immunity from liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Thus, it must be determined at the earliest possible stage of the litigation. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ). The requirement that qualified immunity be determined at the earliest possible stage of the litigation "calls upon courts, not juries, to settle the ultimate questions of qualified immunity." *Johnson v. County of Los Angeles,* 340 F.3d 787, 791 (9th Cir.2003); *see also Lindsey v. Shalmy,* 29 F.3d 1382, 1384 (9th Cir.1994) ("The question of immunity is not to be 'routinely place[d] . . . in the hands of the jury.' ") (quoting *Hunter,* 502 U.S. at 227, 112 S.Ct. 534). Otherwise, qualified immunity would rarely be decided until after trial, which defeats the purpose of having qualified immunity from suit.

Whether a defendant is entitled to qualified immunity is a two-part inquiry. The first step is to ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In *Saucier,* the Supreme Court disapproved

---

**1.** For a more detailed account of Joshua's interrogations, *see Crowe,* 303 F.Supp.2d at 1060–61.

**2.** For a more detailed account of Aaron's interrogations, *see Crowe,* 303 F.Supp.2d at 1059–61.

of the Ninth Circuit's former practice of denying summary judgment "any time a material issue of fact remains" because such a practice "could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'" *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

■ As the First Circuit noted in *Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 61–62 (1st Cir.2004), given that *Saucier* involved a motion for summary judgment, the Court in *Saucier* created an ambiguity regarding a plaintiff's evidentiary burden when qualified immunity is raised in the summary judgment context by stating that courts must "determine whether, *on the facts alleged,* a constitutional violation could be found . . . ." *Saucier*, 533 U.S. at 207, 121 S.Ct. 2151. However, like the First Circuit, this court concludes that the Supreme Court in *Saucier* did not intend by its choice of language to nullify Fed. R.Civ.P. 56(c)[3] and (e)[4] and overrule its well-established precedent interpreting Rule 56 as requiring a plaintiff to come forward with sufficient *evidence* in the form of depositions, answers to interrogatories, admissions on file and affidavits from which a factfinder at trial could rule in the plaintiff's favor. *See First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ("What Rule 56(e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposi-

tion to a properly supported summary judgment motion made against him."); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient *evidence* favoring the nonmoving party for a jury to return a verdict for that party.") (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

First, other portions of *Saucier* are written in such a way as to suggest that the Court did not intend to dispense with the requirements of Rule 56 in the context of a qualified immunity analysis brought at the summary judgment stage. For example, the Court states that "if a violation could be made out on a favorable view *of the parties' submissions,* the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (emphasis added); *see also Saucier*, 533 U.S. at 211, 121 S.Ct. 2151 ("I agree that Katz's submissions were too slim to put officer Saucier to the burden of trial.") (Ginsburg, J., concurring in the judgment). Second, it is difficult to conclude that the Supreme Court, if it intended to overrule its earlier and well-estab-

---

**3.** Rule 56(c) provides in relevant part that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

**4.** Rule 56(e) provides in relevant part that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

lished precedent regarding a plaintiff's summary judgment burden, would do so tacitly in a case where the issue was never raised. Finally, as the First Circuit explained, "[s]ubsequent Supreme Court cases have clarified, implicitly if not explicitly, that courts assessing the first prong at summary judgment should look beyond the complaint to the broader summary judgment record." *Riverdale Mills Corp.*, 392 F.3d at 62 (citing *Groh v. Ramirez*, 540 U.S. 551, ——, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004) and *Hope v. Pelzer*, 536 U.S. 730, 734 n. 1, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). For example, in *Groh*, the Supreme Court, in determining whether the defendants had violated the plaintiff's rights in the context of a motion for summary judgment on qualified immunity grounds, explained that "*'[t]he evidence* of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" *Groh*, 540 U.S. at 562, 124 S.Ct. 1284 (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505) (emphasis added). For these reasons, this court will construe the facts here in the light most favorable to plaintiffs only to the extent that the facts alleged by plaintiffs are supported by evidence of record as required by Rule 56(c) and (e) and Supreme Court case law interpreting these summary judgment rules.

If, construing the evidentiary record in the light most favorable to the plaintiff, a court concludes that the plaintiff's rights were violated, then the court must proceed to the second step of the qualified immunity analysis, pursuant to which the officer is entitled to qualified immunity if the law was not "clearly established," *i.e.*, if it would not have been clear to a reasonable officer that his conduct was unlawful under the circumstances. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. "Whether the law was clearly established is a pure question of law for the court to decide." *Carnell v. Grimm*, 74 F.3d 977, 978 (9th Cir.1996).

The clearly-established inquiry, "it is vital to note, must be undertaken in light of the specific context of the case, *not as a broad general proposition....*" *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (emphasis added). Thus, "[t]he relevant, dispositive inquiry" is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.*

It is important to note that courts of appeal have been tempted to meld the two prongs of the qualified immunity test, particularly in the Fourth Amendment context. The argument is that it is inappropriate to give qualified immunity to officials who have violated the Fourth Amendment by unreasonably searching or seizing because qualified immunity is intended to protect reasonable official action. In other words, the argument is that "[i]t is not possible ... to say that one 'reasonably' acted unreasonably." *Anderson v. Creighton*, 483 U.S. 635, 643, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). However, such an argument has been squarely rejected by the Supreme Court. *See id.; Saucier*, 533 U.S. at 203–04, 121 S.Ct. 2151.

Most recently, in *Brosseau v. Haugen*, —— U.S. ——, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*), the Supreme Court reversed the Ninth Circuit's opinion denying qualified immunity to an officer who shot a fleeing suspect in the back. The Court criticized the Ninth Circuit for finding that the law was clearly established based on the very general test of *Graham v. Connor* that "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Brosseau*, —— U.S. at ——, 125

S.Ct. at 599. The Court explained that although such a general test may "in an obvious case" clearly establish that an officer's conduct was unlawful, such a general standard is not sufficient to clearly establish the law where the case is not one involving run-of-the-mill facts. *Id.* The Court went on to consider the "handful of cases relevant to the 'situation [Brosseau] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at ——, 125 S.Ct. at 600. The Court concluded that the "cases taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case." *Id.* Noting that none of the cases squarely governed but did suggest that Brosseau's actions "fell in the 'hazy border between excessive and acceptable force,'" the Court concluded that these cases did not "clearly establish" that Brosseau's act of shooting the plaintiff in the back violated the Fourth Amendment. *Brosseau,* —— U.S. at ——, 125 S.Ct. at 600 (quoting *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151).

Keeping in mind this analytical framework, the court now turns to the claims that are the subject of defendants' motions.

## II. First Claim for Relief—Violation of the Fourth Amendment

### Michael's Arrest

Michael contends that defendants violated his Fourth Amendment right to be free of unreasonable seizures by arresting him without probable cause.[5] *See Beck v. Ohio,* 379 U.S. 89, 90–91, 85 S.Ct. 223, 13

L.Ed.2d 142 (1964) (holding that the Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits arrests without probable cause); *McKenzie v. Lamb,* 738 F.2d 1005, 1007 (9th Cir.1984) (explaining that arrests without probable cause give rise to a § 1983 damages action). Defendants seek summary judgment on the merits as well as on qualified immunity grounds.

### A. An Issue for the Court

■ As set forth in section I, *supra,* in determining whether defendants are entitled to qualified immunity, the court must necessarily address the merits of Michael's claim. *See Brosseau,* —— U.S. at ——, 125 S.Ct. at 598 ("When confronted with a claim of qualified immunity, a court must ask first the following question: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'") (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). Thus, although the question of whether there was probable cause to arrest is generally an issue for the jury in the context of a § 1983 action, *see McKenzie,* 738 F.2d at 1008, where, as here, a defendant seeks summary judgment based on the doctrine of qualified immunity, the existence of probable cause is necessarily an issue for the court. *See Saucier,* 533 U.S. at 207, 121 S.Ct. 2151 (instructing "district courts and courts of appeals to concentrate at the outset on the definition of the constitutional right and to determine whether ... a constitutional violation could be found").

5. Although defendants, apparently out of an abundance of caution, address the constitutionality of Michael's placement at the Polinsky Children's Center under the Fourth Amendment, the court does not address this argument, because a review of the complaint and Michael's opposition to the motion suggests that Michael is not pursuing a Fourth Amendment claim predicated upon his placement at the Polinsky Children's Center. However, in section V, *infra,* the court addresses Michael's Fourteenth Amendment challenge to his placement there.

Again, this is because qualified immunity is immunity from suit, not simply immunity from liability, see *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806, and therefore it must be determined at the earliest possible stage of the litigation. *Hunter,* 502 U.S. at 227, 112 S.Ct. 534.

Thus, the initial issue this court must ask and answer in order to determine whether defendants are entitled to summary judgment on qualified immunity grounds with respect to Michael's Fourth Amendment claim is whether, considering all of the evidence presented on summary judgment in the light most favorable to Michael, there was probable cause for his arrest.

### B. Standard for Determining Probable Cause

■ A warrantless arrest must be supported by probable cause. *See United States v. Bueno–Vargas,* 383 F.3d 1104, 1107 (9th Cir.2004). "The long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing law in the community's protection.'" *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). For purposes of the Fourth Amendment,[6] "[p]robable cause exists when, under the totality of the circum-

stances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *Peng v. Mei Chin Penghu,* 335 F.3d 970, 976 (9th Cir.2003) (quoting *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir.1999) (citations and quotations omitted)). In other words, "[a]rresting officers have probable cause to make warrantless arrests if, *at the moment of arrest,* facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense." *United States v. Hillison,* 733 F.2d 692, 697 (9th Cir.1984) (emphasis added).

■ Michael contends that in determining whether his warrantless arrest is supported by probable cause, the court is confined to considering the facts set forth in the declaration of probable cause that was filed with the state court in support of Michael's arrest as required by California law. It is well-established that "[t]he validity of a *search warrant* depends upon the sufficiency of what is found within the four corners of the underlying affidavit." *United States v. Taylor,* 716 F.2d 701, 705 (9th Cir.1983) (emphasis added); *see also United States v. Rubio,* 727 F.2d 786, 795 (9th Cir.1983); *United States v. Martinez,* 588 F.2d 1227, 1234 (9th Cir.1978); *United States v. Anderson,* 453 F.2d 174, 177 (9th

---

6. The standard for a warrantless arrest under California law has been stated slightly differently in some cases. For example, the Ninth Circuit, citing California case law, has stated that "[u]nder California law, an officer has probable cause for a warrantless arrest 'if the facts known to him would lead a [person] of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'" *Peng v. Mei Chin Penghu,* 335 F.3d 970, 976 (9th Cir.2003) (quoting *People v. Adams,* 175 Cal.App.3d 855, 221 Cal.Rptr.

298, 301 (1985) (citation and quotations omitted)). However, other California cases have set forth the standard in language identical to the Fourth Amendment standard in all relevant respects. *See People v. Talley,* 65 Cal.2d 830, 835, 56 Cal.Rptr. 492, 423 P.2d 564 (1967) ("Reasonable or probable cause exists when the facts and circumstances within the knowledge of the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense.").

Cir.1971). Moreover, in *United States v. Castillo,* 866 F.2d 1071 (9th Cir.1988), the Ninth Circuit applied the "four corners" rule where a defendant challenged a magistrate judge's determination that there was probable cause to issue *an arrest warrant.* However, the parties have failed to cite, and the court's own research has failed to reveal, a case holding that for purposes of determining whether *a warrantless arrest* violated the Fourth Amendment, a court is confined to considering the facts in a declaration of probable cause.

None of the cases Michael cites for this proposition—*People v. Privett,* 55 Cal.2d 698, 12 Cal.Rptr. 874, 361 P.2d 602 (1961), *People v. Talley,* 65 Cal.2d 830, 56 Cal. Rptr. 492, 423 P.2d 564 (1967) or *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)—so hold. To the contrary, these cases are authority for the proposition that "[w]hen the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts *available to the officers at the moment of the arrest* would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck,* 379 U.S. at 96, 85 S.Ct. 223 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)) (emphasis added); *see also Privett,* 55 Cal.2d at 701, 12 Cal.Rptr. 874, 361 P.2d 602 ("The question of probable cause to justify the arrest of Edwards and the search of the premises incident thereto must be tested upon the facts which the record shows were known to the officers at the time the arrest was made."); *Talley,* 65 Cal.2d at 835, 56 Cal.Rptr. 492, 423 P.2d 564 ("The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made."). Although *Privett* and *Talley* refer to the need to consider the facts "which the record shows were known to the officers," neither case mentions a declaration of probable cause, and nothing in either case suggests that "the record" in that case consisted of a declaration of probable cause.

Moreover, the court has been unable to find a single case in which the Ninth Circuit has confined its probable cause analysis to the four corners of a probable cause declaration when evaluating the constitutionality of a warrantless arrest. Rather, the Ninth Circuit has consistently evaluated the legality of warrantless arrests by considering all of the facts *known to the officers at the time of the arrest. See United States v. Martin,* 509 F.2d 1211, 1213 (9th Cir.1975) (explaining that in determining whether a warrantless arrest is supported by probable cause, a court "must consider *all the facts known to the officers* and consider *all the reasonable inferences that could be drawn by them before the arrest*") (emphasis added); *United States v. Bernard,* 623 F.2d 551, 559 (9th Cir.1980) (citing *Martin* ); *Hillison,* 733 F.2d at 697 ("Arresting officers have probable cause to make warrantless arrests if, at the moment of arrest, facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense."). The conclusion that a probable cause determination is not confined to the four corners of the declaration of probable cause is further supported by the fact that the Ninth Circuit has specifically considered such factors as the officer's experience and expertise and the knowledge and testimony of other officers at the scene in determining whether a warrantless arrest is supported by probable cause. *See Hillison,* 733 F.2d at 697 (explaining that in considering whether there was probable cause to make a warrantless arrest, "the court properly could take into account the experience and ex-

pertise of Drug Enforcement Administration agents observing" the defendant's activity); *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir.1990) (explaining that in evaluating probable cause for a warrantless arrest, "[w]hen there has been communication among agents, probable cause can rest upon the investigating agents' 'collective knowledge' ") (quoting *Bernard*, 623 F.2d at 560–61); *see also United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir.1994) (quoting *Del Vizo* ). Thus, the probable cause analysis here will not be confined to the facts set forth in the declaration for probable cause that was executed in support of Michael's arrest.

## C. No Fourth Amendment Violation

■ The court concludes that defendants had probable cause to arrest Michael, and therefore did not violate the Fourth Amendment by arresting him, given all of the information in defendants' possession at the time of the arrest (including information regarding the time of Stephanie's death and the position and state of Stephanie's body, Michael's statements regarding seeing Stephanie's door closed at 4:30 a.m., and the state of the windows and doors) and considering all of the reasonable inferences that could be drawn from those facts. *See Martin*, 509 F.2d at 1213 (explaining that in determining whether a warrantless arrest is supported by probable cause, a court "must consider all the facts known to the officers *and consider all the reasonable inferences that could be drawn by them* before the arrest") (emphasis added). Although in determining the facts in defendants' possession the court construes the evidence in the light most favorable to Michael, in determining the reasonable inferences that could be drawn from those facts, the court need not accept only the inferences posited by Michael because the court must consider "all the reasonable inferences" that could be drawn from the facts. *See id.*

As the First Circuit has explained, "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." *Cox v. Hainey*, 391 F.3d 25, 32 (1st Cir.2004); *cf. United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.").

### 1. Information Defendants Had Regarding Time of Death

As Michael admits in his opposition, Stephanie was stabbed to death between 10:00 and 11:00 p.m., and defendants had this information at the time of his arrest. *See* Plaintiff Michael Crowe's Points and Authorities in Opposition to Defendants Ralph Claytor, Mark Wrisley, Barry Sweeney, Phil Anderson, and City of Escondido's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment of the Claims Asserted by Michael Crowe ("Michael's Opposition") at 19:4–17.

### 2. Information Defendants Had Regarding Stephanie's Body

A review of the crime scene photographs reveals that Stephanie was wearing jeans and a shirt at the time of her death. Cheryl stated during her videotaped interview that it was "weird" that Stephanie was found in her clothes because, although she sometimes fell asleep in her clothes, she usually slept in a big T-shirt and sweats. Transcript of Videotaped Examination of Cheryl Ann[sic] Crowe, January 21, 1998, at 35:1–14. A reasonable officer could have surmised from this statement that it was possible that Stephanie was awake at the time her killer entered her room. Given the fact that no one in the house heard Stephanie scream or heard the Crowe family dog bark, a reasonable officer could

have suspected that the murderer was not a stranger to Stephanie.

Defendants arrived at the crime scene after the emergency medical technicians, John Peters and Steve Mandich. Peters and Mandich have testified that when they arrived Stephanie's body was in the position depicted in the actual crime scene photographs. *See* Deposition of John Peters at 48:6–9 and Deposition of Steve Mandich at 28:8–29:5 (Exhibits B and C, Defendants' NOL re: Michael's Claims filed April 26, 2004). A review of the crime scene photographs reveals that Stephanie's body was in the doorway of her bedroom with the door opening into the bedroom. *See* Exhibit I, attached to Defendants' Reply to Michael Crowe's Opposition to Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment. It is undisputed that, unlike Michael's bedroom door, Stephanie's bedroom was not directly off of the main hallway, but, rather, an alcove connected Stephanie's bedroom to the main hallway. Deposition of Stephen Crowe at 85:28–86:17 (Exhibit 13, Michael's Exhibits). It cannot be disputed that if one were to draw a line to represent the bedroom door in a closed position, Stephanie's head in the crime scene photographs would be on the alcove side of that line while the remainder of her body would be on the bedroom side of that line. It also cannot be disputed that if Stephanie died in this position, with her head in the alcove, the door was open when she died because it would be physically impossible for the door to be closed with her in that position.

The position of Stephanie's body is important to the probable cause analysis because, as will be discussed in section II. C.3, *infra,* Michael made statements to the police that he saw Stephanie's door closed at 4:30 a.m., which would have been impossible had Stephanie been dead in the doorway of her bedroom by 11:00 p.m.

Much of Michael's brief is devoted to attempting to create a genuine issue of material fact regarding the location of Stephanie's body when she died by demonstrating that a reasonable factfinder could find that the family members moved the body prior to the arrival of the EMTs. However, the relevant inquiry in a probable cause analysis is not whether Stephanie was actually moved prior to the EMT's arrival but, rather, what information, if any, the police had at the time of Michael's arrest that suggested that one or more of the family members moved the body prior to the EMT's arrival and that, therefore, Stephanie did not die in the position that she was found by the EMTs. *See Martin,* 509 F.2d at 1213; *Bernard,* 623 F.2d at 559; *Hillison,* 733 F.2d at 697.

### a. What Cheryl and Stephen Told Defendants Prior To Michael's Arrest

A review of Cheryl's videotaped questioning by police reveals that she did not tell defendants that she moved Stephanie's body. Moreover, Cheryl drew a diagram of the crime scene for defendant Sweeney which a reasonable officer could interpret as showing Stephanie's head in the alcove, consistent with the crime scene photographs. *See* Exhibit K, attached to Defendants' Reply to Michael Crowe's Opposition to Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment.

A review of Stephen's videotaped questioning by police reveals that Steven did not tell defendants that he moved Stephanie's body or that she was found in her room with the door closed. In fact, Stephen denied moving the body, as illustrated by the following colloquy between Stephen and defendant Sweeney at the police station:

Q. Think of this though, Steve. After you tried to use the phone, you tried

to pick her up. Did you move her at all?

A. No. I couldn't move her. She was stiff. She was all stiff and I couldn't move her . . . .

Transcript of Videotaped Examination of Stephen Crowe, January 21, 1998, at 15:20–24. Stephen did not make any statements in his recorded interview about the position of the body *vis-a-vis* the doorway.

Cheryl and Stephen now both state in their declarations filed in opposition to the motion for summary judgment: "Every time I was interviewed by the police I told them the true position of Stephanie's body, which was inside the room." *See* Omnibus Decl. of Stephen Crowe ¶ 3 (Exhibit 44), Plaintiff Michael Crowe's List of Documents Presented in Opposition to [Defendants'] Motion for Summary Judgment or in the Alternative, Partial Summary Judgment of the Claims Asserted by Michael Crowe ("Michael's Exhibits"); Omnibus Decl. of Cheryl Crowe ¶ 4 (Exhibit 45, Michael's Exhibits). Moreover, Cheryl now states that she believes that she moved Stephanie, while Stephen states that he did move Stephanie. *See* Omnibus Decl. of Cheryl Crowe ¶ 24; Omnibus Decl. of Stephen Crowe ¶ 3. However, there is a videotape of Cheryl and Stephen being interviewed by the police officer defendants, and it cannot be disputed that during these tape recorded interviews not only did Cheryl and Stephen not make statements indicating that Stephanie's entire body, including her head, was inside the room or that her body was moved but they made statements to the contrary. Moreover, Stephen testified at his civil deposition that when he found Stephanie her head was in the alcove and the remainder of her body was in her room. Specifically, Stephen testified:

Q. When you got out into the hallway and you got to Stephanie, where was she?

A. She was laying on the floor. There's an alcove that goes back and it's the depth of the closet. It's about three feet. · Her head was lying—her body was inside her room and her head was right at the doorjamb.

Q. If you drew a line at the position where the door would be if it was fully shut—if you drew that line across the doorjamb, was her head or any part of her body on the hallway side or the alcove side of that line?

A. Yes, her head was.

Q. How much of her head?

A. Just from the neck up.

Q. So if you drew that line across there, it would bisect her neck; is that correct?

A. That's correct.

Deposition of Stephen Crowe at 85:28–86:17 (Exhibit 13, Michael's Exhibits). Thus, Cheryl and Stephen's statements regarding what they remember telling police more than six years ago, which are inconsistent with their recorded statements to police and with Stephen's deposition testimony, are not sufficient to require this court to assume on this motion for summary judgment that defendants knew or should have known that the body was not initially in the position depicted in the crime scene photographs. *See Burrell v. Star Nursery, Inc.,* 170 F.3d 951, 954 (9th Cir.1999) (refusing to reverse district court's grant of summary judgment based on plaintiff's affidavit, which contained allegations that "appeared for the first time" in the affidavit and which contradicted her earlier deposition testimony); *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991) ("The general rule in the Ninth Circuit is that a party cannot create

an issue of fact by an affidavit contradicting his prior deposition testimony.").

Moreover, even if Cheryl and Stephen were interviewed by police at another time, which it is not clear on this record that they were, the fact that they may have at that time told the police that Stephanie had been moved and was not in the position in which she was found by the EMTs does not establish that, for purposes of the probable cause analysis, defendants were required to assume that Stephanie died inside her bedroom with the door closed. Police officers are constantly required to sift through volumes of evidence and witness statements that are not always consistent, and the police must make judgment calls regarding which witness statements to believe and which not to believe. Given the statements of Cheryl and Stephen in their recorded interviews, it was not unreasonable for defendants to conclude, for purposes of determining whether there was probable cause to arrest Michael, that Stephanie died in her doorway with the door open. This is true even if Cheryl and Stephen made other, unrecorded statements to the contrary.

#### b. What Kennedy Told Defendants Prior to Michael's Arrest

A review of Kennedy's videotaped questioning by police reveals that Kennedy did not tell police that she moved the body.[7] Although Michael contends that Kennedy told defendants prior to Michael's arrest that when she found Stephanie, Stephanie was in her room and that the door was closed, this is a mischaracterization of her statements, as the following colloquy between defendant Wrisley and Kennedy illustrates:

W: When you got up due to the alarm and you went out and you found Stephanie *in the doorway* I guess there—

K: Uh-huh [yes] [8]

W. Did you go into her room at all?

K: No, I just stepped inside and I saw her laying there and I thought this is—something's wrong here . . . .

Transcript of Videotaped Examination of Judith Ann Kennedy, January 21, 1998, at 22:14–18. Having reviewed this portion of the videotape, it is clear that Kennedy did not correct defendant Wrisley when he referred to Stephanie being "in the doorway" and that Kennedy answered "no" to the question of whether she went into Stephanie's room. As noted, it is undisputed that, unlike Michael's bedroom door, Stephanie's bedroom was not directly off of the main hallway, but, rather, an alcove connected Stephanie's bedroom to the main hallway. Thus, it was entirely reasonable for defendant Wrisley to believe that Kennedy was referring to "stepping inside" the alcove and not Stephanie's bedroom.

In addition, it must be noted that because the relevant question here is what evidence defendants had in their possession regarding the position of Stephanie's body *at the time they arrested Michael for her murder,* Michael's assertion to the contrary notwithstanding, it is irrelevant what Kennedy stated about the position of the body at the proceeding (referred to as a "707 hearing")[9] which was held in order to

---

7. In fact, Judith Kennedy has consistently maintained throughout this civil litigation that she did not move the body. *See* Judith Kennedy DT p. 16:1–4 (Exhibit D, Response of Defendant Barry Sweeney to Plaintiffs' Supplemental Reference to the Evidence in Opposition to MSJ or in the Alternative, Partial Summary Judgment)

8. This utterance by Kennedy is not reflected in the transcript of the videotape but is clearly evident to a listener of the videotape.

9. *See* Cal. Welf. & Inst.Code 707.

determine whether Michael should be tried in adult rather than juvenile court, as that hearing occurred after his arrest.

Finally, because the probable cause inquiry is whether the inferences defendants drew from the facts in their possession were reasonable, that plaintiffs' expert, Victor Cestaro, has, based on blood smears, opined [10] that Stephanie died inside her bedroom with the door closed does not mean that a reasonable officer could not have concluded based on all of the information in defendants' possession that Stephanie died with her head in the alcove and door open as depicted in the crime scene photographs. *See Cox*, 391 F.3d at 32 ("[T]he availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable.").

In conclusion, given that (1) when defendants arrived on the scene Stephanie's body was in the doorway, in that her head was in the alcove and the rest of her body was in the bedroom; (2) defendants had in their possession statements by the family that were consistent with Stephanie's body being found in the doorway; (3) and it would be physically impossible for the door to be closed with Stephanie's body in that position, a reasonable officer could have based his probable cause determination on the assumption that Stephanie died in the doorway of her bedroom with the door open.

### 3. Michael's Story

It is undisputed that in two different interviews Michael told defendants that he woke up at 4:30 a.m. and went to the kitchen to get some Tylenol because he had a headache. In both interviews, Michael stated that there was enough light that he could see that Stephanie's door was shut. Specifically, during one questioning, Michael stated as follows:

Q. What was the next thing that you remember?

A. I woke up and I turned on the TV so I could see, and I think the clock said 4:30.

. . .

Q. Did you turn the TV on to watch it or just turn it on to—

A. Turned it on to see around the room.

Q. Kind of using that for light?

A. Yes.

Q. Then what did you do?

A. I had a horrible headache, so I got up out of bed, went to the kitchen.

Q. Now, your bedroom door is open or closed?

A. When I sleep?

Q. No. When you woke up and you went on your way to the kitchen, was it opened or closed.

A. I think I left it open.

Q. When you went out, I know you got to into the hallway to get to the kitchen, correct?

A. Yes.

Q. How could you see where you were going?

A. I think the light by what you call the front doors, the double doors, that light was on. I think there is an automatic switch on it.

. . .

Q. How about the hallway light, is it on or off?

A. I'm pretty sure it was off.

Q. *And obviously when you leave your room, your view is right across to*

---

**10.** *See* Exhibits 56 and 57, Michael's Exhibits.

*Stephanie's room. And is her room opened or closed?*

A. *Closed.*

Q. *And you see nothing unusual at all?*

A. *Nothing unusual.*

Q. Did you go to the kitchen?

A. Yes.

. . .

Q. How long were you in the kitchen?

A. Fifteen minutes. When I got back I left the TV on and I think it said 4:45.

. . .

Q. *So Stephanie's door was shut?*

A. *Yes.*

Q. And what about mom and dad's door?

A. I believe it was shut, too.

Q. And grandma and Shannon's?

A. I believe everything was shut.

Q. *If the only light is coming from like here, how could you tell if the doors were shut?*

A. *I believe I turned on my own light and my door was left open, so I could see the rest of the hallway.*

Q. *You turned on your bedroom light before you left the room?*

A. *Yes.*

Q. *So when you returned back to the room, the light was still on?*

A. *And that kind of illuminated the hallway a little?*

Q. *Yes.*

. . .

Q. . . . When you got back to your room, you again didn't notice anything?

A. Didn't notice anything.

Q. Nothing unusual?

A. Nothing unusual.

Q. When you got back to your room, what was the next thing you did?

A. I dropped [sic] the milk, took the Tylenol in my room, set the box over there. Then I turned off my light and turned off the TV.

Police Interview of Michael Crowe Taken at the Polinsky Center January 22, 1998, at 21:23–25:28 (Exhibit K, Defendants' NOL re: Michael's claims filed April 26, 2004) (emphasis added). Later that day, Michael again told the police that Stephanie's door was closed:

A. The next thing I remember after that I woke up with a bad headache. I turned on the TV so I could see in my room because it was dark. The clock on the TV, I think it said 4:30. So I got up and I opened the door, turned on the light, you know, went down to the kitchen to get some Tylenol for my headache. I took the Tylenol and drank the milk. I turned off my light, turned off the TV. I shut my door and went to sleep. . . .

Q. Okay. Can you tell me about the lighting in the house?

A. One light, I think, was left on. I turned on my light and I left my door open and I went to the kitchen, so I could see fairly—I'm pretty sure. I was half asleep and I had a headache, so I think I turned on the kitchen light, as well . . . .

. . .

A. I remember when I walked back all the doors being shut.

Q. Okay. You remember them all being shut. Can you define that for me?

A. All the doors in the hallway, all four, all five of them but the bathroom.

Q. And you're pretty sure about that?

A. I'm pretty sure.

. . .

Q. . . . And the door to Stephanie's room?

A. Yeah, I think that was shut.

Q. That was shut. You're pretty confident about 4:30?

A. Yes.

Q. And could you briefly describe the lighting in the hallway?

A. I didn't turn on the hallway light, I don't think, but I did have my door open with my light on. So it was dim, but I could still see pretty well. Like I said I was still half asleep at the time. I kind of stumbled into the kitchen.

Videotaped Interview of Michael Stephen Crowe, January 22, 1998 at 7:27–10:17 (Exhibit U, Defendants' NOL re: Michael's claims filed April 26, 2004) (emphasis added).

Given that the information in defendants' possession suggested that Stephanie was dead by 4:30 a.m. and that she died in her doorway with the door open, Michael's statements that Stephanie's door was closed at 4:30 a.m. would have given a reasonable officer reason to believe that Michael was lying and was involved in Stephanie's murder.

Michael's contention in his declaration that he initially stated to defendants in an unrecorded interview that he did not know whether Stephanie's door was closed when he went to the kitchen at 4:30 a.m. does not change the fact that, as detailed *supra*, Michael made later, unequivocal statements that there was sufficient light to see and that he was certain that Stephanie's door was closed. Michael fails to cite any

authority for the proposition that his later statements cannot be considered in determining whether there was probable cause to arrest him because these statements were made, in some instances, in response to leading questions. A reasonable officer could have relied on these later statements in making a probable cause determination.

**4. The state of the windows and doors**

Finally, the state of the windows and doors is another factor upon which a reasonable officer could have relied in forming the belief that Michael was involved in Stephanie's murder.

*a. The laundry room or "front" door*

Construing the facts in the light most favorable to Michael, at the time of Michael's arrest, defendants knew that fellow officer Scott Walters saw the door to the Crowe house close at approximately 9:58 p.m. on the night of the murder. However, a reasonable officer could have concluded that an intruder[11] was not entering through the laundry room door at that time. Although defendants knew that the members of the Crowe household denied that they were the ones who closed the door, Michael operates under the mistaken assumption that a police officer must believe everything a suspect says, and that when a suspect is arrested based on facts that are different than those relayed by the suspect, probable cause cannot exist. This is not, however, the standard. *See Ahlers v. Schebil,* 188 F.3d 365, 371 (6th Cir.1999) ("In fact, law enforcement 'is under no obligation to give any credence to a suspect's story [or alibi] nor should a plau-

---

11. Certainly, the police could have believed that someone entered the house through that door. However, because, as will be explained, the evidence suggested that the laundry room door was locked by 9:00 p.m., *see*

Exhibit 295, the police could have believed that the individual who closed the door as Officer Walters looked on was not an intruder in the classic sense.

sible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.'") (quoting *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir.1988)); *see also Taylor v. Paladines*, 983 F.Supp. 750, 753 (N.D.Ill.1997) (concluding that police officer was entitled to qualified immunity where the officer arrested an innocent individual who provided an explanation for her actions prior to her arrest). If this were the standard, confronted with two conflicting sets of facts—with one set of facts being relayed by the suspect—the police would certainly hesitate to arrest a suspect unless they were sure that the evidence proved beyond a reasonable doubt that the suspect was guilty. Otherwise, the police would risk the suspect not being convicted and then suing them. Again, "[t]he long-prevailing standard of probable cause protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' *while giving 'fair leeway for enforcing law in the community's protection.'" Pringle*, 540 U.S. at 369, 124 S.Ct. 795 (quoting *Brinegar*, 338 U.S. at 176, 69 S.Ct. 1302). This probable cause standard recognizes that the police will not always arrest the right person and must be able to weigh evidence and make reasonable judgment calls about who is lying to them and who is not.

That a police officer need not believe every piece of information a suspect conveys is particularly true when information gained from the suspect is inconsistent with other evidence. Here, it is undisputed that in an unrecorded interview prior to Michael's arrest, Kennedy told defendant Sweeney that before going to bed at approximately 9:00 p.m. she checked the sliding glass door and the laundry room door to see if they were locked. *See* Exhibit 295. Michael concedes that Kennedy told Sweeney that the lock was "right." *See* Michael's Opposition at 25:4. Michael has

presented evidence from which it could be concluded that given the way that lock on the laundry room door operates, Kennedy could have been indicating that the door was unlocked. However, the inquiry is what defendants could have reasonably believed based on Kennedy's statement that the lock was "right." *See Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir.1996) (explaining that the fact that there might be "'another reasonable or more reasonable interpretation of events'" does not mean that a reasonable officer could not have believed that his conduct was justified), *overruled on other grounds by Acri v. Varian Assocs. Inc.*, 114 F.3d 999 (9th Cir.1997) (quoting *Hunter*, 502 U.S. at 228, 112 S.Ct. 534). It was not unreasonable for defendants to interpret Kennedy's statement as a statement that the door was locked when she checked it, because a reasonable officer could conclude that one would not check a door to see if it was locked but not lock it if it was found to be unlocked.

Moreover, Stephen Crowe told defendants that the laundry room door, which the family referred to as the "front door," was locked the morning that Stephanie was discovered murdered. Specifically, he stated:

Q. And Cheryl's mom usually goes and checks to make sure the doors are all locked also. In fact, the door to the laundry room was locked this morning also. The dead bolt was latched. So I tried to unlock (inaudible) door. I pulled on the door and it wouldn't open because someone locked the dead bolt. *That's why I would assume Cheryl's mom shut the front door before retiring.*

A. Okay. I know. You call that the laundry door?

Q. Yeah. The far door (inaudible).

Transcript of Videotaped Examination of Stephen Crowe at 9:18–27 (emphasis add-

ed). Thus, even though each of the family members denied being the one who opened and closed the door at approximately 9:58 p.m., given the evidence suggesting to defendants that Kennedy locked the door at approximately 9:00 p.m., it would not be unreasonable for defendants to conduct their investigation based on the assumption that it was possible that it was not an intruder who Officer Walters saw closing the laundry room or "front" door at 9:58 p.m.

Michael points out that according to Sweeney's notes from an unrecorded interview of Kennedy, Kennedy said that the family never used the deadbolt on that door. *See* Exhibit 295. However, given all of the other information in defendants' possession regarding the state of the doors and windows and the state of the laundry room door in particular and given that Stephen appeared to assume that Kennedy was the one who deadbolted the door, this statement by Kennedy does not serve to negate the existence of probable cause to arrest Michael.

### b. *Stephanie's Window*

A reasonable officer could have concluded that the killer did not enter or exit through Stephanie's bedroom window. Stephanie's window, which was a metal slider, was not locked nor completely closed due to a phone cable leading from the outside which entered the room through the window in the bottom corner. However, a review of the crime scene photographs shows two flag-like objects hanging underneath the windows as decorations which appear undisturbed. A review of the photograph of this window also reveals that it is some distance from the ground and that, although someone could certainly enter the room through the window, the window would not provide easy ingress or egress.

Michael notes that Stephanie's friend, Amanda Reidy, told defendants that she was talking to Stephanie between 9:45 and 10:00 p.m. and Stephanie stated that the cat had come in through her window. However, the fact that Stephanie's window was open during her telephone conversation is not a fact that would compel the police to conclude that the killer came through the window because Stephanie could have closed the window after the conversation.

### c. *The sliding doors off of the kitchen*

A reasonable officer could have concluded that the killer did not enter the house through either of the sliding glass doors off of the kitchen. One of the sliding glass doors was found to be closed and locked during the investigation. Although defendants found the other sliding door closed but unlocked, Stephen Crowe stated in his videotaped interview that he unlocked that sliding door on the morning of the murder. *See* Transcript of Videotaped Examination of Stephen Crowe at 8:17–9:16.

### d. *The master bedroom sliding glass door*

Michael contends that the police should have concluded that killer was an intruder who either entered or exited through the sliding door in the master bedroom door because the door was unlocked [12] and be-

---

**12.** Although Michael contends that the master bedroom door was partially open, there is no evidence of record suggesting that the master bedroom door was partially open. When asked about the condition of the master bedroom door, Sweeney testified that he believed "it was closed but not locked." Deposition of Barry Sweeney at 143:7 (Exhibit 14, Mi-

chael's Exhibits). When later asked whether the door was slid into the frame, Sweeney answered, "I don't recall how closed it was. *If it was open*, it was only about an inch or two inches, but I don't recall how closed it was." *Id.* at 144:4–6. Officer Houchin testified that he was aware that the door was

cause, although the vertical blinds covering the door were closed, one of the blinds was hung up on the handle of the door and the screen on the door was partially opened, which was consistent with someone going through the door with the blinds closed. Therefore, Michael argues, defendants should have known that Michael was not the killer.

Although the state of the door may have been consistent with someone passing through the door, the other evidence defendants had in their possession suggested that the killer did not pass through this door on the night of the murder. Although Cheryl stated that she was in her bedroom by 10:00 p.m., she also stated to police that she did not go to sleep until 11:00 p.m.—which, as Michael admits in his opposition, is the latest time at which Stephanie was alive. *See* Transcript of Videotaped Examination of Cheryl Ann[sic] Crowe at 14:4–6; Michael's Opposition at 19:4–7. Given the fact that defendants had reason to believe that Stephanie was dead by the time that Cheryl went to sleep, the unlocked state of the door and the state of the vertical blinds did not negate the existence of probable cause to believe that Michael was involved in Stephanie's murder.

### d. The garage door

The door to the double-car garage was closed but not locked. Michael makes much of this fact; however, no reasonable officer could have concluded that it was possible for the killer to enter the house through the garage door because a review of crime scene photograph 4, which according to the date stamp was taken approximately a week after the murder, reveals that the garage door swings out, and pho-

tographs 3 and 5, which were taken the day Stephanie's body was discovered as evidenced by the ambulance in the driveway, reveals that there were two vehicles parked in front of the door, which would have made it impossible for someone to open the garage door. *See also* Escondido Police Department Evidence Report, Exhibit F, Defendants' NOL re: Crowe Family's Claims filed April 26, 2004 (noting that two vehicles were parked in front of the garage door on the morning of the murder).

### e. The remaining doors and windows

It is undisputed that the remaining doors and windows were locked. Michael notes that the double doors that most would refer to as the front doors to the house have the type of lockset that allows one to exit even though the door is locked to the outside. Therefore, an intruder could have left the house by means of these doors. However, as noted, a reasonable officer could have concluded from all of the evidence in defendants' possession regarding the state of the windows and doors that an intruder did not enter the Crowe house on the night of the killing, and therefore the fact that an intruder could have escaped through the front door did not negate the existence of probable cause to believe that Michael was involved in Stephanie's killing.

### 5. Why the information the police had regarding Tuite did not negate the existence of probable cause

Michael spends numerous pages of his opposition setting forth facts and arguments regarding why Tuite, the transient

---

unlocked. *See* Deposition of John Houchin at 141:23–25 (Exhibit 16, Michael's Exhibits). Officer Houchin did not testify that the door was partially open. Nowak's report states

that the door was unlocked but closed. *See* Exhibit 93 to Plaintiffs' Supplemental List of Evidence Supporting Opposition to Sweeney's Motion.

who was ultimately convicted of Stephanie's murder, was the real killer. Michael contends that it was Tuite that Officer Walters saw entering the Crowe house at approximately 9:58 p.m. and that after, killing Stephanie, Tuite exited either through the master bedroom sliding glass door or through the double front doors. Michael's tack is unavailing, however.

The issue here is not who killed Stephanie but, rather, whether reasonable, not perfect, police officers could have believed at the time of Michael's arrest that Michael was involved in Stephanie's murder. As will be demonstrated, even though defendants did have evidence in their possession placing Tuite in the vicinity of the Crowe house at the time of the murder, a reasonable officer possessing this evidence could have nonetheless concluded at the time of Michael's arrest that Michael, not Tuite, was involved in Stephanie's murder.

Michael correctly notes that at the time of Michael's arrest, defendants had eye witness accounts placing Tuite in the neighborhood of the Crowe house at the time of the murder. Those eye witness accounts described an individual who was loud, drunk or high, and agitated and who was knocking on doors looking for "Tracy." *See Crowe,* 303 F.Supp.2d at 1075. However, as noted in section II.C.4, *supra,* a reasonable officer could have concluded from the information defendants had regarding the state of the windows and doors that Tuite's only means of ingress was Stephanie's window or the Crowe master bedroom sliding glass door. Specifically, given that a reasonable officer could have believed that the laundry room or "front" door was locked by Judith Kennedy at 9:00 p.m., and given that Stephen stated that this door was locked in the morning, a reasonable officer could have concluded that Tuite did not enter the Crowe house through that door at approximately 10:00 p.m. Given that the clothed state of Ste-

phanie's body suggested that she was awake when the killer entered her room and given that no one in the house heard Stephanie scream, a reasonable officer could have concluded that a loud and agitated individual such as Tuite did not enter Stephanie's room through her window. Given that Stephanie was dead by 11:00 p.m. and given that Cheryl Crowe told defendants that she did not go to sleep until 11:00 p.m., *see* Transcript of Videotaped Examination of Cheryl Ann[sic] Crowe at 14:4–6, a reasonable officer could have concluded that a loud and agitated individual such as Tuite did not enter or exit the Crowe house through the master bedroom sliding door on the night of the murder.

That a reasonable officer could have discounted the theory that Tuite was the killer is not altered by the fact that both Cheryl and Michael reported hearing banging at some point in the night. Cheryl was not sure what time she heard the banging, and by her own account she thought at the time that she was dreaming. Transcript of Videotaped Examination of Cheryl Ann[sic] Crowe at 16:15–17:12. Similarly, when asked what time he heard the banging, Michael was unable to pinpoint a time, stating simply that he thought it was before midnight. *See* Police Interview of Michael Crowe Taken at the Polinsky Center January 22, 1998, at 19:12–21:14 (Exhibit K, Defendants' NOL re: Michael's claims filed April 26, 2004). However, importantly, Cheryl reported that she heard the banging after she went to sleep, and defendants had reason to believe that Stephanie was dead by the time that Cheryl went to sleep. *See* section II.C. 1, *supra.* Because a reasonable officer could have concluded from Cheryl and Michael's statements that the banging occurred after Stephanie's death, and because both Cheryl and Michael indicated that they thought that the banging came

from the laundry room door, which as explained in Section II.C.4.a, *supra,* a reasonable officer could have believed was locked, a reasonable officer could have discounted the fact of the banging in determining there was probable cause to arrest Michael.

Michael also points to several statements made by Cheryl that defendants had in their possession at the time of Michael's arrest. First, Cheryl reported in her videotaped interview that her bedroom door opened and closed twice "in the middle of the night." Specifically, Cheryl reported:

> Something weird happened. I don't know if it was (inaudible) something opened my door twice. I don't know what it was *in the middle of the night.* I thought it was the cats, but I don't know how it could have been the cats, cause we have cats. They opened it and then shut it. Opened it and then shut it. (inaudible) I fell back to sleep. I feel really bad because I didn't get up. Why didn't I get up? (inaudible) More I think about it, the more I think the cats can't shut the door and open it. (inaudible) I don't know. That wasn't a real (inaudible) woke up.

Transcript of Videotaped Interview of Cheryl Ann [sic] Crowe at 23:23–24:5 (emphasis added). Michael contends Tuite was the one who opened the master bedroom door and defendants should have known this. However, as detailed in this section, *supra,* the evidence defendants possessed at the time of the arrest suggested that Tuite did not enter the Crowe house. Moreover, given that the information defendants possessed suggested that Stephanie was dead by the time that Cheryl Crowe went to sleep, if Tuite was the one who opened the master bedroom door in the middle of the night after Cheryl went to sleep, Tuite would have had to have remained in the Crowe house unde-

tected for some time after the killing, a proposition that a reasonable officer could have found to be unlikely given Tuite's agitated state.

### 6. The Alleged Conspiracy to "Pin" the Crime on Someone in the House

A significant part of Michael's brief is also devoted to demonstrating that there was a conspiracy amongst the defendants to "pin" the crime on one of the members of the Crowe household. However, this tack is availing, as the motive of the police in arresting a defendant is irrelevant to a determination of whether there was probable cause to arrest. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."); *Lee v. Gregory,* 363 F.3d 931, 935 (9th Cir.2004) ("Gregory is correct that allegations of ulterior motives cannot invalidate police conduct that is justified by probable cause.") (citing *Whren v. United States,* 517 U.S. 806, 811–15, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

Finally, in a footnote, Michael criticizes the police for apparently failing to ask if anything in the house was moved or was out of place, a question which, if asked, may have led to the discovery of facts that may have led to a belief early on that Tuite was the murderer. However, the Fourth Amendment does not guarantee citizens that the police will conduct a perfect crime scene investigation or that they will arrest the right person—the Fourth Amendment

simply guarantees that the police will not arrest without probable cause. As one district court has explained:

> Although this standard may seem harsh from the perspective of one who is wrongfully arrested, it is well grounded in policy and the real-world life of investigating officers. Often, officers must make arrest decisions based upon information that is incomplete and still developing. To subject officers to liability for wrong decisions—or for not conducting a thorough investigation—would chill investigative work and, no doubt, result in guilty parties being allowed to flee or intimidate witnesses.

*Ahlers v. Schebil,* 994 F.Supp. 856, 877 (E.D.Mich.1998), *aff'd,* 188 F.3d 365 (6th Cir.1999). It is not the place of the judiciary to dictate the manner of homicide investigations after the fact. Rather, it is the role of the judiciary to evaluate whether, given the facts in the possession of the police at the time of the arrest, a reasonable police officer could have believed that the individual arrested committed the crime. That standard is met here.

### D. Even Absent Probable Cause to Arrest, Defendants are Entitled to Qualified Immunity

■ Even if it were to be determined that there was not probable cause to arrest Michael, a reasonable police officer confronted with the facts outlined above could have believed there was probable cause to arrest Michael for Stephanie's murder, and therefore defendants would be entitled to qualified immunity. *See Johnson,* 340 F.3d at 793–4 ("Because we conclude that Deputy Woodard did not violate Johnson's Fourth Amendment rights, we need not reach the immunity inquiry. However, had we concluded that the use of force was not objectively reasonable, we could not conclude that it was a violation of Johnson's *clearly established* rights.") (internal citation omitted).

■ As the Supreme Court has explained, in the Fourth Amendment context, it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," and "in such cases those officials—like other officials who act in ways they reasonably believe to .be lawful—should not be held personally liable." *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. As the Ninth Circuit aptly noted in *Smiddy v. Varney,* 665 F.2d 261 (9th Cir.1981), "[i]t is necessary that police officers be immune when they reasonably believe that probable cause existed, even though it is subsequently concluded that it did not, because they 'cannot be expected to predict what federal judges frequently have considerable difficulty in deciding and about which they frequently differ among themselves.' " *Id.* at 266 (quoting *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1349 (2d Cir.1972) (Lumbard, J., concurring)). Thus, a police officer is entitled to qualified immunity if a reasonable officer possessing the same facts as the defendant officer *could have* reasonably believed that the search or arrest was supported by probable cause even if a court later determines it was not. *See Bilbrey v. Brown,* 738 F.2d 1462, 1467 (9th Cir.1984) ("Appellees could therefore qualify for immunity from damages if they reasonably, but mistakenly, believed that they had reasonable cause or probable cause to search appellants."); *see also Forster v. County of Santa Barbara,* 896 F.2d 1146, 1147–1148 (9th Cir. 1990) (finding an officer is "qualifiedly immune from a suit for damages . . . unless 'a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant' ") (quoting *Malley v. Briggs,* 475 U.S.

335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

■ Even though the court must take the *facts* in the light most favorable to Michael, the court need not accept only Michael's version of what constitutes a *reasonable inference from those facts,* as the inquiry is not whether *every* reasonable officer would have believed there was probable cause but whether *any* reasonable officer could have believed there was probable cause based on the facts in defendants' possession and the reasonable inferences that could be drawn from those facts. *See Reynolds,* 84 F.3d at 1170 (explaining that a police officer should not be denied qualified immunity simply because other officers could disagree with the challenged conduct). As the Fourth Circuit has explained in the context of a qualified immunity analysis, to the extent there is a factual dispute concerning what the police officer knew, the dispute must be resolved in the § 1983 plaintiff's favor; however, to the extent a police officer decided to discount conflicting evidence in his possession, the court "need not accept such discounted evidence in the light most favorable to" the plaintiff. *Gomez v. Atkins,* 296 F.3d 253, 261 (4th Cir.2002), *cert. denied,* 537 U.S. 1159, 123 S.Ct. 964, 154 L.Ed.2d 893 (2003). Otherwise, the possibility of qualified immunity would be eliminated in § 1983 cases because "the officer could never be deemed to have acted reasonably." *Id.* Thus, to the extent an officer discounted certain evidence, the court "must assess whether, in so doing, he acted in an objectively reasonable manner ...." *Id.*

Ninth Circuit case law is in accord. For example, the Ninth Circuit has held that "[t]he fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable" because "[t]he inquiry is not 'whether another reasonable or more reasonable interpretation of events can be constructed ... after the fact.'" *Reynolds,* 84 F.3d at 1170 (quoting *Hunter,* 502 U.S. at 228, 112 S.Ct. 534). "Rather, the issue is whether a reasonable officer could have believed that his conduct was justified." *Reynolds,* 84 F.3d at 1170. *"'This is so notwithstanding that reasonable officers could disagree on the issue.'" Id.* (quoting *Act Up!/Portland v. Bagley,* 988 F.2d 868, 872 (9th Cir.1993)) (emphasis added).

As detailed *supra,* defendants had a number of facts in their possession from which a reasonable officer could have believed there was probable cause to arrest Michael Crowe. First, Stephanie was found dead in her clothes, which her mom thought was "weird" and which could have suggested to a reasonable officer that Stephanie was awake when her attacker entered her room. Combined with the fact that none of the other five members of the household heard Stephanie scream, a reasonable factfinder could have suspected that Stephanie knew her attacker. Although defendants knew that a crazed transient was in the neighborhood and that members of the Crowe household denied that they were the ones who Officer Walters saw opening and closing the laundry room or "front" door around 10:00 p.m., given the fact that Kennedy told police that she checked that door around 9:00 p.m., a reasonable officer could have believed that the door was locked by 10:00 p.m. and therefore the killer was not a transient who came in through that door.

Moreover, a reasonable officer could have found Michael's statements regarding Stephanie's door being closed to be suspicious. Even assuming that the police had some information in their possession suggesting that Stephanie died completely inside her bedroom, they had contrary videotaped statements by Cheryl and Stephen suggesting that Stephanie died in her doorway and was not moved prior to the arrival of the EMTs. Furthermore, a reasonable officer could have interpreted

Kennedy's statements as being consistent with Stephanie's body being in the doorway. Thus, a reasonable officer could have pursued the investigation based on the belief that Stephanie died no later than 11:00 p.m. with the door open.

Furthermore, even if Michael initially stated to police that he did not know whether Stephanie's door was open or closed when he went to the kitchen at 4:30 a.m., it is undisputed that he subsequently stated unequivocally in two subsequent taped or videotaped interviews that he saw that Stephanie's door was closed. In light of these facts, it would not have been clear to a reasonable officer that there was no probable cause to arrest Michael, even taking into account the additional evidence defendants had at that time regarding Tuite.

Finally, it is irrelevant whether defendants were engaged in a conspiracy to "pin" the murder on Michael because qualified immunity is not to be denied because of a police officer's subjective beliefs or motives. *See Anderson*, 483 U.S. at 641, 107 S.Ct. 3034 ("The relevant question in this case, for example, is the objective ... question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed. Anderson's subjective beliefs about the search are irrelevant.").

### Strip Search of Michael Crowe

On January 21, 1998, Michael Crowe underwent a strip search whereby he removed all of his clothes except his underwear and was photographed. A strip search is constitutional if the individual to be searched gives consent, if the consent is freely given. *Good v. Dauphin County Social Servs.*, 891 F.2d 1087, 1093 (3rd Cir.1989).

A review of Michael's civil deposition testimony reveals that he gave his consent to the search and the photographs and that his consent was freely given. Specifically, Michael testified:

Q. Do you recall anything else your father said about the subject of the photographs?

A. Later, right before he did it, he told us just to go ahead and do it and help them out. Just do whatever we could to help.

Q. Did he say why he wanted you to go ahead and do the photos to help out?

A. He just told us to go do the photos to help out.

Q. When he said to help out, did you understand that to mean that he was asking you to go ahead with the photographs to help the officers determine what had happened to Stephanie?

A. Yes.

Q. Were you willing to do that then?

A. Yes.

Q. *Then did you voluntarily partake in the photographing process?*

A. *Yes.*

Deposition of Michael Crowe at 139:12–140:1 (Exhibit Q, Defendants' NOL re: Michael's claims filed April 26, 2004) (emphasis added). Moreover, in his papers Michael does not deny that he gave consent, nor does he contend that his consent to the search and the photographs was not voluntary. Accordingly, defendants are entitled to summary judgment to the extent that Michael contends that his Fourth Amendment right to be free of unreasonable searches was violated by the strip search.

### Strip Search of the Crowe Family

 On January 21, 1998, the Crowe family was subjected to strip searches and photographs. Defendants have failed to demonstrate that, as a matter of law, any consent that Cheryl, Stephen or Shannon gave to the strip searches was given freely. Moreover, defendants have failed to demonstrate that the strip search of these plaintiffs was constitutionally reasonable.[13] In addressing the constitutionality of strip searches, the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) explained:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559, 99 S.Ct. 1861. The most important factors here are the scope of the strip searches and the justification for them.

The searches of Cheryl, Stephanie and Stephen were extremely intrusive. Stephen was photographed completely nude. Cheryl was photographed without her underwear and Shannon was photographed without a bra.

On the other hand, the justification for initiating these strip searches was nonexistent. Defendants contend that the stripping and photographing of Shannon was necessary to ensure that Shannon had no injuries or signs of mistreatment. However, defendants have failed to demonstrate that they had sufficient reason to believe that Shannon was the subject of abuse to

subject her to such a search. Moreover, defendants fail to explain why it was necessary for Shannon to take off her bra in order to determine whether Shannon was the victim of abuse of why it was necessary to photograph her given that no signs of abuse were discovered.

Defendants contend that the stripping and photographing of Cheryl and Stephen was necessary because it was reasonable for the police to check for signs of struggle such as scratches, cuts and bruises. However, defendants have failed to demonstrate that there was sufficient reason to believe at the time of the strip searches that either Cheryl or Stephen were involved in Stephanie's murder.

Finally, defendants contend that because Cheryl was found lying on top of Stephanie and because Cheryl was later seen hugging the other family members, "[e]vidence from the crime scene and from the body could have thus been transferred at least to Cheryl Crowe and then to the remaining members of the Crowe Family in the very minutes after the murder was discovered." Memorandum of Points and Authorities in Support of [Defendants'] Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment of the Claims Asserted by the Crowe Family at 11:17–19. While this reasoning might justify the collection of the families' clothes, it does not justify requiring Cheryl, Shannon or Stephanie to submit to a strip search and photographing, as occurred here.

For purposes of the analysis of defendants' motion, the court concludes that defendants violated the Fourth Amendment by requiring Cheryl, Shannon and Stephen to submit to a strip search. Moreover, a reasonable officer under the

---

**13.** Plaintiffs do not raise the issue of whether the police must obtain a warrant to perform a strip search under circumstances such as were present here, where plaintiffs were not in custody at the time of the search. Therefore, the court does not consider this issue.

same circumstances would have known that there was not sufficient justification to support the searches. Accordingly, defendants' motion for summary judgment is denied with respect to this claim.

### Seizure of Hair and Blood from Michael

■ On January 27, 1998, Detective Claytor sought and obtained a warrant to collect hair and blood samples from Michael. *See* Exhibit W, Defendants' NOL re: Michael's claims filed April 26, 2004. "Intrusions into the human body, including the taking of blood, are searches subject to the restrictions of the Fourth Amendment." *United States v. Wright*, 215 F.3d 1020, 1025 (9th Cir.2000). To be consistent with the Fourth Amendment, a warrant for such an intrusion must be supported by probable cause. *Id.* The specific inquiry is whether there is "probable cause to believe that the suspect has committed an offense of which the current state of [his] blood will constitute evidence." *United States v. Chapel*, 55 F.3d 1416, 1419 (9th Cir.1995).

■ As explained in detail, *supra*, there was probable cause to arrest Michael. Therefore, given the brutality of the murder, the amount of blood at the scene, and the hair evidence that was collected, there was probable cause to believe that Michael's blood and hair would constitute evidence.

Alternatively, because a reasonable officer could have believed that there was probable cause to arrest Michael, a reasonable officer could have believed that Michael's blood would constitute evidence.

Accordingly, defendants are entitled to summary judgment as to the seizure of Michael's blood and hair.

### Seizure of Blood From Cheryl and Stephen

On February 5, 1998, defendant Claytor sought and obtained search warrants for blood samples from Cheryl and Stephen. On February 6, 1998, Cheryl and Stephen provided blood samples pursuant to the warrants.

[16] The validity of this search warrant "depends upon the sufficiency of what is found within the four corners of the underlying affidavit." *Taylor*, 716 F.2d at 705. In the affidavit in support of the warrant, defendant Claytor represented (1) that Stephanie Crowe had been stabbed to death in her home; (2) that Cheryl and Stephen Crowe were in the house at the time of Stephanie's death; (3) that blood analysis would tend to show that a "particular" (but unspecified) person committed the murder; and (4) that to have valid test results, all persons that had contact with the victim needed to be eliminated as a source of the blood. *See* Exhibits P and Q, Defendants' NOL re: Crowe family's claims filed April 26, 2004. Nothing in defendant Claytor's affidavit establishes probable cause to believe that Cheryl and Stephen were involved in Stephanie's death, and, in fact, defendants do not argue that there was probable cause to believe at the time the warrant was obtained that Cheryl and Stephen were involved in Stephanie's death. Rather, defendants argue that the seizure of the blood was supported by probable cause because the blood was sought to prove that someone other than Cheryl or Stephen killed Stephanie by eliminating Cheryl and Stephen as the source of the blood at the scene of the crime. This argument is unavailing because pursuant to Supreme Court case law "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt, *and that the belief of guilt must be particularized with respect to the person to be searched or seized.*" *Pringle*, 540 U.S. at 371, 124 S.Ct. 795 (internal quotation marks and citations omitted) (emphasis

added); *see also Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by *probable cause particularized with respect to that person.*") (emphasis added). Ninth Circuit case law is in accord. *See Marks v. Clarke,* 102 F.3d 1012, 1027 (9th Cir.1996) (citing *Ybarra* ); *Rise v. State of Or.,* 59 F.3d 1556, 1560 (9th Cir.1995) ("[T]he drawing of blood from free persons generally requires a warrant supported by *probable cause to believe that a person has committed a criminal offense* and that *his blood* will reveal evidence relevant to that offense ....") (emphasis added), *overruled on other grounds by City of Indianapolis v. Edmond,* 531 U.S. 32, 121. S.Ct. 447, 148 L.Ed.2d 333 (2000); *see also Wright,* 215 F.3d at 1025–26 (finding probable cause to order defendant to provide blood sample in robbery case where robber, who was shot, left blood at the scene and where a tip, combined with additional pieces of evidence, established a fair probability that the defendant was the robber); *Chapel,* 55 F.3d at 1419 (requiring probable cause to believe that the suspect has committed an offense and that the state of his blood will constitute evidence). In light of this case law, a warrant to draw blood is not supported by probable cause where the evidence is sought to prove that another individual has committed a crime by demonstrating that the individual subject to the blood draw did not commit the crime. Because the facts in the warrant did establish there was a reason to believe that Cheryl or Stephen Crowe were involved in Stephanie's murder, the search warrant for the seizure of their blood was not valid.

▮ Having concluded that the warrant was not supported by probable cause, the next issue is whether defendant Claytor is nonetheless entitled to qualified immunity because it would not have been clear to a reasonable officer that there was no probable cause for the seizure of Cheryl's and Stephen's blood. Where a police officer obtains a warrant, immunity will be lost "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Mills v. Graves,* 930 F.2d 729, 731 (9th Cir.1991); *see also Malley,* 475 U.S. at 344–5, 106 S.Ct. 1092 ("[W]here the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable .... the shield of immunity be lost."); *Forster,* 896 F.2d at 1147–48 ("A police officer is qualifiedly immune from a suit for damages arising from an allegedly illegal arrest or search unless 'a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'") (quoting *Malley,* 475 U.S. at 345, 106 S.Ct. 1092); *Marks,* 102 F.3d at 1026 n. 31 (quoting *Malley* ). In light of cases such as *Ybarra* and *Marks,* which were decided prior to the obtaining of the warrant and which require probable cause *particularized with respect to the person subject to the search or seizure,* a reasonably well-trained officer in defendant Claytor's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

▮ This court notes that California law provides that "[a] search warrant may be issued ... [w]hen the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony." West's Ann.Cal.Penal Code § 1524(a)(4). Defendant Claytor's apparent reliance on this statute does not, however, entitle him to qualified immunity, as the contours of the Fourth Amendment

are not dictated by state law. *See Knowles v. Iowa*, 525 U.S. 113, 116, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (answering in the affirmative the question "whether the search at issue, authorized as it was by state law, nonetheless violates the Fourth Amendment"); *United States v. Becerra-Garcia*, 397 F.3d 1167, 2005 WL 237647 (Feb. 2, 2005) ("The weight of authority establishes that the test of whether a search or seizure violates the Fourth Amendment 'is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.' ") (quoting *Elkins v. United States*, 364 U.S. 206, 224, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)); *see also Henry v. County of Shasta*, 132 F.3d 512, 522 (9th Cir.1997) (reversing and remanding grant of summary judgment on plaintiff's Fourth Amendment claim because the district court failed to "address the fundamental question whether the officers' conduct, while consistent with the California statutes, was constitutional."). Because it was clearly established at the time the warrant for the Crowes' blood was obtained that a search that comports with state law does not automatically comport with the Fourth Amendment, *see Henry*, 132 F.3d at 522, a reasonable officer would not have believed that he was entitled to seek the warrant simply because state law appeared to authorize a warrant under the circumstances.

Accordingly, the motion for summary judgment is denied with respect to this claim.

### Search of the Crowe Residence

The Crowes bring a Fourth Amendment claim arising out of the search of the house in which they were living at the time of Stephanie's murder. Defendants seek summary judgment with respect to this claim.

"Probable cause to search exists when the known facts and circumstances are sufficient to warrant a reasonable person to conclude that contraband or evidence of a crime will be found." *United States v. Ibarra*, 345 F.3d 711, 716 (9th Cir.2003). The Crowes do not dispute that the warrant to search the house was supported by probable cause or that they gave their consent to search the house. Rather, plaintiffs challenge the extent to which the house, which they were renting, was damaged by defendants in the course of gathering evidence.

 In executing a search warrant, officers may need to damage property. *See Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir.2000); *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir.1997); *Dalia v. United States*, 441 U.S. 238, 258, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). "Therefore, the destruction of property during a search does not necessarily violate the Fourth Amendment." *Mena v. City of Simi Valley*, 226 F.3d at 1041; *see also United States v. Becker*, 929 F.2d 442, 446 (9th Cir.1991). " '[O]nly unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively, violates the Fourth Amendment.' " *Mena*, 226 F.3d at 1041 (quoting *Liston*, 120 F.3d at 979); *see also Becker*, 929 F.2d at 446.

 According to Cheryl's declaration, when the family returned to the house it was in "rack and ruin." Omnibus Decl. of Cheryl Crowe ¶ 16 (Exhibit 45, Michael's Exhibits). The police had taken "all of the carpet in the hallway, from Stephanie's room, and all of the hallway drywall by Stephanie's room." *Id.* ¶ 17. So much drywall and carpet had been removed that the family had to move out of the house, which they were renting. Moreover, according to Cheryl's declaration, "the removal was so extensive that the structure was affected" and the city had to "come in and shore it up." *Id.* at ¶ 17. The Crowes

had to vacate the house because the owner couldn't afford to make the repairs.

Although one can certainly sympathize with a family who, after experiencing the horrific death of their child, is forced to move out of the house they call home, the test is whether defendants engaged in unnecessarily destructive behavior, beyond that needed to execute the warrant effectively.[14] That is not the case. The Crowes have failed to provide any evidence suggesting that defendants took carpeting or drywall from other than the immediate crime scene area—the hallway carpet and drywall and the carpet from Stephanie's room. Given the potential of the carpet and drywall to yield clues in the form of blood, fiber, hair and fingerprints, it cannot be said on this record that defendants crossed over the line drawn by the Fourth Amendment when they removed these items from the house, thereby damaging the house in the process.

Moreover, even if defendants did cross over the line in their collection of evidence, which they clearly did not, a reasonable officer could have believed that removing the carpet and drywall from the crime scene and the immediate surrounding area was necessary and, therefore, constitutional. Thus, defendants would be entitled to qualified immunity.

Accordingly, defendants are entitled to summary judgment with respect to this claim.

### The Detention of the Crowes at the Police Station

Cheryl and Stephen bring a Fourth Amendment claim based upon their alleged detention at the police station. According to plaintiffs, when Cheryl and Ste-

phen attempted to leave the police station through a secured door, defendant Wrisley pulled out his gun and pointed it at Stephen's chest, and ordered Stephen and Cheryl back upstairs, where defendant Wrisley told the couple after 15 to 30 minutes that they had to go to a hotel and couldn't go with Stephen's brother, as Stephen had requested. *See* Omnibus Decl. of Stephen Crowe ¶¶ 20, 21 (Exhibit 44, Michael's Exhibits). Stephen further states that defendant Wrisley "said we had to say there and couldn't leave unless we called him first and got permission and told him where we wanted to go." *Id.* at ¶ 21.

"A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Taking the facts in the light most favorable to plaintiffs, defendants used a show of authority to detain Cheryl and Stephen for 15 to 30 minutes, which constitutes a seizure triggering the Fourth Amendment's protection.

Because defendants have failed to explain why they were justified in restraining Cheryl and Stephen's liberty or why a reasonable officer would have believed there was justification for restraining their liberty, this claim cannot be resolved on summary judgment.

### III. Second Claim for Relief—Violation of the Fifth Amendment

Defendants seek summary judgment with respect to Michael's claim for viola-

---

**14.** Clearly, under such a test, defendant's motives or subjective intentions in conducting the search are irrelevant. Thus, the Crowes' attempt to demonstrate that the resulting damage was due to defendant's malicious motives and not due to their interest in collecting evidence is unavailing. *See Whren*, 517 U.S. at 813, 116 S.Ct. 1769 (explaining that an officer's subjective intentions are irrelevant in a Fourth Amendment analysis).

tion of the Fifth Amendment privilege against self-incrimination. The court previously addressed the scope of § 1983 liability for violation of the Fifth Amendment self-incrimination clause. *See Crowe,* 303 F.Supp.2d at 1086–93. A review of Michael's opposition to the current motion does not change this court's previous conclusion regarding the scope of § 1983 liability for violation of the Fifth Amendment.

 The Fifth Amendment, which applies to the States via the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), provides that no person "shall be compelled in any criminal case to be a witness against himself. . . ." U.S. CONST. amend. V. As the court explained in its previous order, the operation of the Fifth Amendment is clear in some respects. For example, the Fifth Amendment clearly affords one the right to assert the privilege of silence when being questioned in criminal or civil proceeding "wherever the answer might tend to subject to criminal responsibility him who gives it." *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). Moreover, if the assertion of that privilege is ignored or the privilege is involuntarily waived, it is clear that the Fifth Amendment operates to preclude the government's use of the resulting compelled testimony at trial in its case in chief. *See Oregon v. Elstad,* 470 U.S. 298, 306–7, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). What is not entirely clear is when a § 1983 action may be predicated upon a violation of the Fifth Amendment.

The Supreme Court in *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) was confronted with the issue of whether the § 1983 plaintiff, Martinez, had made out a Fifth Amendment claim where the police had compelled statements from Martinez during interrogation but where those statements were never used by the police or prosecutors because Martinez was never charged with a crime. Justice Thomas, joined by the Chief Justice and two other Justices, concluded:

> Here, Martinez was never made to be a "witness" against himself in violation of the Fifth Amendment's Self–Incrimination Clause *because his statements were never admitted as testimony against him in a criminal case. Nor was he ever placed under oath and exposed to* " 'the cruel trilemma of self-accusation, perjury or contempt.' " *Michigan v. Tucker,* 417 U.S. 433, 445, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)).

*Chavez,* 538 U.S. at 767, 123 S.Ct. 1994 (emphasis added) (Thomas, J.). This same plurality also explained that although the Supreme Court has "permitted the Fifth Amendment's self-incrimination privilege to be *asserted* in noncriminal cases, that does not alter our conclusion that a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself *in a criminal case." Id.* at 770, 123 S.Ct. 1994 (internal citations and quotations omitted) (first and third emphasis added). Although declining to define the term "criminal case," this plurality concluded that a "criminal case" does not include an interrogation. *See id.* at 766–7, 123 S.Ct. 1994 ("We need not decide today the precise moment when a 'criminal case' commences; it is enough to say that police questioning does not constitute a 'case' any more than a private investigator's precomplaint activities constitute a 'civil case.' ").

Although agreeing that Martinez was not entitled to pursue a damages claim for violation of his Fifth Amendment rights, Justice Souter, joined by Justice Breyer,

approached the issue before the Court from a policy perspective, concluding that Martinez' claim should fail on the ground that Martinez could not "make the 'powerful showing,' subject to a realistic assessment of costs and risks, necessary to expand protection of the privilege against compelled self-incrimination to the point of the civil liability he asks us to recognize here." *Id.* at 778, 123 S.Ct. 1994 (Souter, J., concurring in the judgment) (quoting *Miranda v. Arizona,* 384 U.S. 436, 515, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan, J., dissenting)).

■■■ After *Chavez,* it is clear that the mere act of coercing a confession is not a Fifth Amendment violation upon which a § 1983 claim may be predicated. However, by failing to define "criminal case" as that term is used in the Fifth Amendment, the Thomas plurality left open the issue of whether a § 1983 plaintiff may predicate a Fifth Amendment claim on the use of a coerced confession short of use at trial. Moreover, the Justices in *Chavez* did not directly address a second issue raised here: whether, as Michael urges, a § 1983 plaintiff may predicate a Fifth Amendment claim on the use of a coerced confession at the trial of another. As set forth in detail in *Crowe,* 303 F.Supp.2d at 1086–91, this court has concluded that a § 1983 claim cannot be predicated upon the use of a coerced confession short of use at trial because "criminal case" means "criminal trial." The court need not repeat its reasoning here. Rather, the court now turns to Michael's contention that his statements were used against him at two trials: his and that of Richard Tuite.

Michael's argument that the use of his statements by Tuite in an attempt to demonstrate Tuite's innocence is use "against" Michael and that such use satisfies the requirements of the Fifth Amendment is simply unavailing. As noted, the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness *against himself* ...." U.S. CONST. amend. V (emphasis added). Moreover, Justice Thomas in *Chavez* repeatedly noted that the Fifth Amendment is only violated when a statement is used *against the speaker. See* 538 U.S. at 767, 123 S.Ct. 1994 ("Here, Martinez was never made to be a 'witness' *against himself* in violation of the Fifth Amendment's Self–Incrimination Clause because his statements were never admitted as testimony *against him* in a criminal case.") (emphasis added); *id.* at 768, 123 S.Ct. 1994 ("[W]e have long permitted the compulsion of incriminating testimony so long as those statements (or evidence derived from those statements) cannot be used *against the speaker* ....") (emphasis added); *id.* at 769, 123 S.Ct. 1994 ("[M]ere coercion does not violate the text of the Self–Incrimination Clause absent use of the compelled statements in a criminal case *against the witness.*") (emphasis added); *id.* at 770, 123 S.Ct. 1994 (concluding "that a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness *against himself* in a criminal case") (emphasis added); *id.* at 772, 123 S.Ct. 1994 (explaining that "the core constitutional right defined by the Self–Incrimination Clause [is] the right not to be compelled in any criminal case to be a witness *against oneself.*") (emphasis added); *id.* at 772–73, 123 S.Ct. 1994 ("And the absence of a 'criminal case' in which Martinez was compelled to be a 'witness' *against himself* defeats his core Fifth Amendment claim.") (emphasis added). Furthermore, the Supreme Court in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) explained that the Fifth Amendment insures that the use of compelled testimony "cannot lead to the infliction of criminal penalties *on the witness.*" *Id.* at 453, 92 S.Ct. 1653 (emphasis added). The

use of Michael's confession by Tuite's defense team at Tuite's trial in an attempt to create reasonable doubt as to whether Tuite murdered Stephanie could not lead to the infliction of criminal penalties on the witness: Michael. Thus, Michael cannot predicate his Fifth Amendment claim on Tuite's use of Michael's statements at Tuite's trial.

*Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), cited by Michael, is not to the contrary. In *Counselman,* the Supreme Court was confronted with the issue of under what circumstances a witness may assert the Fifth Amendment privilege and refuse to provide testimony. The Court rejected the contention that "a witness is not entitled *to plead the privilege* of silence, except in a criminal case against himself . . . ." *Id.* at 562, 12 S.Ct. 195 (emphasis added). The Court explained:

> It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to ensure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself he committed a crime.

*Id.* at 562, 12 S.Ct. 195. It is upon this language that Michael seizes; however, in *Counselman,* the issue was whether Counselman could be held in contempt for failing to answer questions posed by a grand jury on the ground that his answer would be incriminating, *i.e.* whether he could be punished for *asserting* the privilege, *not* whether *the use* of his compelled statements in a grand jury proceeding or in the criminal trial of another violates the Fifth Amendment. Thus, the Supreme Court's conclusion in *Counselman* that *the privi-lege* of refusing to testify and remaining silent may be *asserted* in a proceeding other than one's one criminal prosecution and that it violates the Fifth Amendment to punish one for *asserting* this privilege under such circumstances does not answer the question here: whether *the use* of compelled statements at another's trial is a Fifth Amendment violation cognizable in the context of a § 1983 action. *See United States v. Antelope,* 395 F.3d 1128, 1141 (9th Cir.2005) (explaining that "[c]ritical to the reasoning of all six justices [in *Chavez* ] was the simple principle that the scope of the Fifth Amendment's efficacy is narrower when used as a sword in a civil suit than when used as a shield against criminal prosecution"); *Chavez,* 538 U.S. at 769, 123 S.Ct. 1994 (explaining that "contrary to the Ninth Circuit's view, mere coercion does not violate the text of the Self–Incrimination Clause *absent use* of the compelled statements in a criminal case *against the witness* ") (Thomas, J.) (emphasis added); *see also id.* at 770, 123 S.Ct. 1994 (explaining that although the Supreme Court has "permitted the Fifth Amendment's self-incrimination privilege to be *asserted* in noncriminal cases, that does not alter our conclusion that a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a *witness against himself in a criminal case* ") (Thomas, J.) (internal citations omitted) (first and third emphases added).

■ Michael also contends that his statements were used at his own criminal trial because they were introduced into evidence during his pretrial motion proceedings as the subject of motions in limine. This court concludes that this argument is unavailing because the Fifth Amendment is only violated by the introduction of a statement at trial in the government's case-in-chief or in its rebuttal.

First, the point of a court holding a pretrial hearing to determine whether a defendant's statements were coerced, and therefore should be excluded as evidence at trial, is to ensure that the defendant's Fifth Amendment rights are protected. It would make little sense to conclude that a defendant's Fifth Amendment rights are violated by the introduction of compelled statements at a motion in limine hearing where the court holds that the statements are inadmissible at trial because they were compelled. Nor does it make sense to conclude that a defendant's Fifth Amendment rights are violated where his statements are introduced at a motion in limine hearing and ruled admissible at trial but the trial never occurs.

Second, the Fifth Amendment ensures that one who is compelled to make statements does not suffer criminal penalties from use of the statement. *See Kastigar*, 406 U.S. at 453, 92 S.Ct. 1653. One does not suffer criminal penalties from use of a compelled statement at a motion in limine hearing, even if the court ultimately holds that the statement is admissible. One is only subjected to criminal penalties from use of a compelled statement if it is actually introduced by the government at the speaker's trial.

Finally, even if it can be said that the Fifth Amendment is violated by the introduction of coerced statements at a motion in limine hearing, defendants would be entitled to summary judgment. For reasons set forth in the court's previous order, defendants would not be the proximate cause of any such Fifth Amendment viola-

tion. *See Crowe*, 303 F.Supp.2d at 1091–92. Moreover, one need only read the numerous and varied opinions in *Chavez* to conclude that the law in this area is not clearly established.

Accordingly, the court grants the motion for summary judgment filed by defendants with respect to Michael's Fifth Amendment claim.

## IV. Fourth Claim for Relief–Fourteenth Amendment Substantive Due Process Clause ("Shocks the Conscience")

### Michael's claim

■ Defendants bring a motion for summary judgment as to Michael's claim for violation of the Fourteenth Amendment substantive due process clause. A review of Michael's opposition reveals that this claim is predicated upon the manner of his interrogation. In light of the Supreme Court's decision in *Chavez*, it is clear that a substantive due process claim may be predicated upon the manner of police interrogation.[15]

### A. An Issue of Law for the Court

■ Although Michael contends that whether defendants' conduct "shocks the conscience" is an issue for the jury, he has failed to cite any case law in support of his contention, and the court's own research reveals case law holding that this determination is an issue of law for the court. *See Hayes v. Faulkner County*, 388 F.3d 669, 674–5 (8th Cir.2004); *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir.1998);

---

**15.** Four Justices in *Chavez* concluded that the Fourteenth Amendment substantive due process clause "would govern the inquiry" in cases involving "police torture or other abuse that results in a confession ...." 538 U.S. at 773, 123 S.Ct. 1994 (Thomas, J.). Although this plurality did not find that the Fourteenth Amendment substantive due process clause was violated under the facts of that case, the remaining five Justices voted to remand the case to the Ninth Circuit to address the defendant's due process claim based on the manner of his interrogation. Thus, it appears that the Supreme Court unanimously agrees that, under the right circumstances, the manner in which police interrogation is conducted may lead to a claim for violation of the Fourteenth Amendment substantive due process clause.

*Benn v. Universal Health System, Inc.,* 371 F.3d 165, 174 (3d Cir.2004). Although the Ninth Circuit in *Onossian v. Block,* 175 F.3d 1169, 1172 (9th Cir.1999) stated in passing that "it is clear that no reasonable trier of fact could find that defendants' actions shock the conscience," there is no basis for drawing the conclusion from this passage that it is Ninth Circuit law that this is an issue of fact for the jury, where nothing in *Onossian* suggests that "[t]he issue was fairly presented to [the panel] and refined through the adversary process" and decided "after careful analysis." *United States v. Johnson,* 256 F.3d 895, 916 (9th Cir.2001) (*en banc* ) (Kozinski, J., concurring); *see also Miranda B. v. Kitzhaber,* 328 F.3d 1181, 1186 (9th Cir.2003) (*per curiam* ) (" '[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit . . . . ' ") (quoting *Johnson,* 256 F.3d at 914) (Kozinski, J. concurring); *United States v. Brandon P.,* 387 F.3d 969, 974 (9th Cir. 2004). Moreover, the Ninth Circuit has long held in criminal cases that whether police conduct has violated the due process clause is a question of law for the court, not an issue for the jury. *See United States v. Wylie,* 625 F.2d 1371, 1378 (9th Cir.1980) ("And finally, the defendants argue that an instruction on outrageous involvement should have been submitted to the jury. It was entirely proper for the district court to deny this request. The question of the outrageous involvement of government agents is a question of law for the court."); *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) ("The existence of police misconduct that contravenes constitutional due process is a question of law."). Given, as will be discussed in greater detail *infra,* that the issue is whether defendants' conduct is shocking to the conscience in "a constitutional sense," *County of Sacramento v. Lewis,* 523 U.S.

833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), it is appropriate for this court, not a jury, to make that determination. *See Armstrong,* 152 F.3d at 581 ("Viewed in the totality of the circumstances, does the defendants' conduct in depriving Armstrong of a constitutional right shock the conscience? Because this inquiry ultimately defines the parameters of the Fourteenth Amendment, we approach the subject as a question of law.").

Moreover, in any event, it is clear that to the extent that the court must reach the merits of Michael's claim as the first step in determining whether defendants are entitled to qualified immunity, the issue of whether defendants violated Michael's rights, *i.e.,* engaged in conduct that "shocks the conscience" in a constitutional sense, is an issue of law for the court in the first instance. *See Saucier,* 533 U.S. at 207, 121 S.Ct. 2151 (referring to the Supreme Court's "instruction to the district courts and courts of appeals to concentrate at the outset on the definition of the constitutional right and to determine whether, on the facts alleged, a constitutional violation could be found").

## B. Defendants' Questioning of Michael Does Not "Shock the Conscience" in the Constitutional Sense

In determining whether police conduct violates the Fourteenth Amendment substantive due process clause, the Ninth Circuit uses the "shocks the conscience" test. *See Fontana v. Haskin,* 262 F.3d 871, 882 n. 7 (9th Cir.2001) (citing *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708). The Supreme Court has made it is clear that this standard requires more than that "private sentimentalism" is offended. *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Instead, the inquiry focuses on whether the challenged conduct

is " 'shocking to the universal sense of justice.' " *Lewis,* 523 U.S. at 850, 118 S.Ct. 1708 (quoting *Betts v. Brady,* 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942)). In other words, the challenged conduct must be " 'conscience shocking, *in a constitutional sense.' " Lewis,* 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)) (emphasis added). Some courts have gone so far as to hold that "the ultimate standard for evaluating a substantive due process claim is whether the challenged government action 'shocks the conscience' of federal judges." *Ruiz v. McDonnell,* 299 F.3d 1173, 1183 (10th Cir.2002); *see also Cruz-Erazo v. Rivera-Montanez,* 212 F.3d 617, 622–623 (1st Cir.2000) ("The question now before the Court is whether the particular conduct alleged by appellants in this case was so egregious that it can properly be said, under these circumstances, to shock the conscience. We find the question to be a close one, as the alleged facts seem to fall in between the extremes of conduct which have previously been found to shock or not to shock the judicial conscience.") (internal footnote omitted); *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir.1995) (reading the Supreme Court case of *Collins v. City of Harker Heights* as "explain[ing] that the standard for judging a substantive due process

claim is whether the challenged government action would 'shock the conscience' of federal judges").

 In the few cases in which it has applied a "shocks the conscience" standard, the Supreme Court has consistently focused on the brutality of conduct that it has found to shock the conscience.[16] *See Crowe,* 303 F.Supp.2d at 1096–7 (detailing Supreme Court case law on this point); *see also Braley v. City of Pontiac,* 906 F.2d 220, 226 (6th Cir.1990) ("Most cases alleging police conduct that shocks the conscience have involved allegations of excessive force or physical brutality."). For example, in the classic case of *Rochin,* the Supreme Court concluded that the conduct of the police shocked the conscience, and that the use of the evidence at trial violated the defendant's Fourteenth Amendment right to substantive due process,[17] where the police, who saw the defendant put something in his mouth when they entered his house, directed a doctor to force an emetic solution through a tube into the defendant's stomach against his will to obtain evidence after struggling unsuccessfully with the defendant to obtain the evidence from his mouth. The Supreme Court, which throughout its opinion focused on the physical brutality of the police conduct, noted that the methods by which the evidence was obtained were "bound to offend even the most hardened

---

**16.** Cases such as *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) are not to the contrary. The issue in *Spano* was whether *the admission of a coerced confession at trial* was a violation of the defendant's Fourteenth Amendment right to due process. *See id.* at 315, 79 S.Ct. 1202 ("This is another in the long line of cases presenting the question whether a confession was properly *admitted into evidence* under the Fourteenth Amendment.") (emphasis added). *Spano* did not apply a "shocks the conscience" standard and did not hold that the police violate the Fourteenth Amendment substantive due pro-

cess clause merely by procuring a coerced confession.

**17.** Although the *Rochin* court did not speak specifically in terms of "substantive" due process, it is nonetheless understood that the *Rochin* decision was based in substantive due process law. *See Hammer v. Gross,* 884 F.2d 1200, 1203 (9th Cir.1989). Interestingly, however, the Supreme Court has explained that *"Rochin,* of course, was decided long before *Graham v. Connor* (and *Mapp v. Ohio* ), and today would be treated under the Fourth Amendment, albeit with the same result." *Lewis,* 523 U.S. at 850, 118 S.Ct. 1708.

sensibilities" and were "too close to the rack and the screw to permit of constitutional differentiation." *Rochin*, 342 U.S. at 172, 72 S.Ct. 205.

In contrast, in *Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448(1957), the Supreme Court rejected the defendant's claim that his conviction for involuntary manslaughter arising out of a vehicular collision violated the substantive due process clause because at trial the government introduced blood evidence that was seized from him by use of a needle while he was unconscious. The Court explained that the distinction between that case and *Rochin* was that "there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician." *Id.* at 435, 77 S.Ct. 408. The Court went on to explain that "[t]his is not to say that the indiscriminate taking of blood under different conditions or by those not competent to do so may not amount to such 'brutality' as would come under the *Rochin* rule." *Id.* at 437–38, 77 S.Ct. 408.

Similarly, in *Irvine v. People of State of California*, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), the defendant sought to invalidate his conviction on the ground that, while he was away, the police had a locksmith make a key to his house and then entered and installed a microphone in the house. The Court declined the defendant's attempt to "bring [his] case under the sway of" *Rochin* because *Rochin* "presented an element totally lacking here—*coercion ... applied by a physical assault upon his person* to compel submission to the use of a stomach pump." *Id.* at 133, 74 S.Ct. 381 (emphasis added).

Most recently in *Chavez*, the Supreme Court again highlighted the fact that the focus of a Fourteenth Amendment substantive due process analysis is the brutality of the police conduct. For example, a plurality of four Justices explained that the Fourteenth Amendment substantive due process clause is applicable in cases involving *"police torture or other abuse* that results in a confession," 538 U.S. at 773, 123 S.Ct. 1994 (Thomas, J.) (emphasis added), and that "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Id.* (quoting *Rochin*, 342 U.S. at 172, 72 S.Ct. 205). Similarly, Justice Stevens concluded that "brutal" police conduct that is "the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by tortuous methods" constitutes a due process violation as a matter of law. *Chavez*, 538 U.S. at at 783–4, 123 S.Ct. 1994 (Stevens, J., concurring in part and dissenting in part).

As the Supreme Court explained in *Lewis*, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." 523 U.S. at 850, 118 S.Ct. 1708. Having reviewed the audiotapes and videotapes of Michael's interviews and interrogations in their entirety as well as the transcripts thereof, and having considered the circumstances surrounding the interrogations, the court concludes that defendants' behavior during the interviews and interrogations, although far from laudable, was not "so egregious, so outrageous, that it may fairly be said" to "shock the conscience" in "a constitutional sense." *Fontana*, 262 F.3d at 882 n. 7; *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708.

Certainly, it cannot be forgotten that Michael was a juvenile at the time of the interrogations, that his sister had just been killed, that he was suffering from a

cold, and that at least one of the interrogations was quite long. However, the interrogations were not sufficiently egregious or outrageous to be "shocking to the universal sense of justice" in the constitutional sense. The facts surrounding the questioning of Michael are quite distinct from the facts surrounding the interrogation in *Chavez.* As in *Rochin,* the police conduct in *Chavez* was "brutal." *See Chavez,* 538 U.S. at 784, 123 S.Ct. 1994 (Stevens, J., concurring in part and dissenting in part). "The District Court found that Martinez 'had been shot in the face, both eyes were injured; he was screaming in pain, and coming in and out of consciousness while being repeatedly questioned about details of the encounter with the police.'" *Id.* at 798, 123 S.Ct. 1994 (Kennedy, J., concurring in part and dissenting in part). Justice Kennedy, joined by Justices Stevens and Ginsburg, concluded that the record supported a finding that the defendant police officer intended to exploit Martinez's physical pain and that Martinez "thought his treatment would be delayed, and thus his pain and condition worsened, by refusal to answer questions." *Id.* at 797, 123 S.Ct. 1994.

Here, while not necessarily pleasant, Michael's questioning lacked such a brutal nature. Defendants did not yell at Michael or even raise their voices. Michael was given food and water and bathroom breaks, even if not always immediately. Although defendants employed a "good cop/bad cop" approach during some of the interviews, such a manner of interrogation is relatively common and certainly not shocking, even when juveniles are involved. Moreover, although defendants continued to push Michael to answer questions after he insisted that he did not remember anything, on this record such conduct simply is not shocking. Although defendants also lied to Michael at times, for example, by stating that Michael's hairs were found in Stephanie's hand, the

Ninth Circuit has concluded that such conduct is not necessarily coercive. *See Pollard v. Galaza,* 290 F.3d 1030, 1034 (9th Cir.2002) ("[W]e have explained that misrepresentations made by law enforcement in obtaining a statement, while reprehensible, does not necessarily constitute coercive conduct."); *see also United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir.2001) (*en banc*) (same). If not coercive, such conduct certainly cannot be deemed shocking. This conclusion is not altered here by the fact that Michael was a juvenile, particularly given that Michael was, by all accounts, an intelligent juvenile who enjoyed sophisticated computer and fantasy games.

Similarly, it is not outrageous in the constitutional sense that defendants attempted to extract confessions from Michael by telling him that he could get treatment rather than jail if he confessed given that the Ninth Circuit has held that such representations do not even rise to the level of being coercive. *See Cunningham v. City of Wenatchee,* 345 F.3d 802, 810 (9th Cir.2003) ("Perez's suggestion that Cunningham's cooperation could lead to treatment rather than prison is also not coercive.").

Moreover, although Michael appears quite emotional during much of the questioning, the use of questions that elicit an emotional response does not necessarily transform the interrogation into one that "shocks the conscience." *Cf. Id.* ("Perez's questions may have unsettled Cunningham, but mere emotionalism and confusion do not invalidate confessions."). In evaluating whether Michael's emotionalism is evidence of a reaction to the type of "brutal" police conduct that would support a substantive due process violation, the court finds somewhat significant Michael's abrupt change in demeanor prior to his final interrogation. Although Michael appeared upset during much of his question-

ing, during his last interrogation, Michael calmly and cooly made chilling statements regarding his hatred of Stephanie, and a viewer of this portion of the videotape could certainly question the sincerity of the emotion displayed during the earlier interrogations.

The court notes that the parties dispute the significance of the fact that Michael told defendants toward the end of his interrogation that they had been "nice" to him. Defendants contend that this is evidence of the fact that the manner of the interrogation was not shocking to the conscience in the constitutional sense, while Michael contends that this statement is consistent with Stockholm Syndrome, which Michael contends is a defense mechanism by which an individual unites with his attackers.

For the record, the diagnostic label of Stockholm Syndrome is counsel's, not Dr. Colarusso's. Moreover, a review of the report of Dr. Colarusso, a psychiatrist, reveals that he does not specifically address the question of why Michael would say that defendants were nice to him. However, in any event, regardless of the motivation for Michael's statement that defendants were nice to him, the court concludes that such statement does little to inform the analysis of whether the interrogations were "shocking to the conscience" in a constitutional sense.

Similarly, the court notes that Michael has presented evidence in the form of (1) a declaration by a lay person, Margaret Hublar, who has viewed the videotapes of his interrogations and opined that defendants' conduct shocked her conscience, *see* Crowe Family's Exhibit 18F, and (2) a report by Dr. Colarusso, who opines that defendants' conduct during the interroga-

tions constituted "emotional child abuse." *See* Michael's Exhibit 60 at 12. Such evidence does not suffice to defeat summary judgment.

Again, whether defendant's behavior "shocks the conscience" for Fourteenth Amendment purposes is an issue of law for the court. *Hayes*, 388 F.3d at 674–75; *Armstrong*, 152 F.3d at 581; *Benn*, 371 F.3d at 174. The relevant inquiry is whether defendants' conduct shocks "'the universal sense of justice,'" *Lewis*, 523 U.S. at 850, 118 S.Ct. 1708 (quoting *Betts*, 316 U.S. at 462, 62 S.Ct. 1252), not whether it offends the "private sentimentalism" of a lay person such as Ms. Hublar or a retained expert such as Dr. Colarusso. *Rochin*, 342 U.S. at 172, 72 S.Ct. 205. Moreover, defendants' conduct must shock the conscience "'in a constitutional sense.'" *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Collins*, 503 U.S. at 128, 112 S.Ct. 1061). In other words, defendant's conduct must be viewed through a legal and constitutional prism that has been narrowly crafted by the Supreme Court, not through the very different prisms of a lay person and a psychiatrist. Thus, neither Ms. Hublar nor Dr. Colarusso are in a position to opine as to whether defendants' conduct shocks the conscience for purposes of the Fourteenth Amendment, and their declarations do not suffice to defeat summary judgment.

■ Although the Ninth Circuit has not always required the type of physical brutality identified by the Supreme Court as necessary for a substantive due process claim, it is clear that even under Ninth Circuit case law, Michael must demonstrate "something more" than that defendants' conduct produced involuntary statements on his part.[18] Michael's reliance on

---

18. The wisdom of such a requirement is obvious. One can only imagine the Pandora's box that would be opened if a substantive due process claim could be predicated upon the mere coercion of a confession without use of the confession at trial or without additional "aggravating circumstances" such as were present in *Cooper*, as discussed *infra*.

*Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir. 1992) (en banc) as authority to the contrary is simply unavailing. In fact, a careful reading of *Cooper* reinforces the conclusion that the mere act of coercing a confession does not arise to the level of conduct that "shocks the conscience." In *Cooper,* the defendants did not simply coerce a confession from a suspect. Rather, as they freely admitted in their depositions, they subjected the suspect, Cooper, to a method of interrogation that they had specifically devised to compel a confession and to hinder Cooper's ability to defend himself at trial, which method involved ignoring Cooper's invocation of the right to remain silent and the right to counsel. As the Ninth Circuit explained:

> *The core of their plan was to ignore the suspect's Constitutional right to remain silent as well as any request he might make to speak with an attorney in connection therewith, to hold the suspect incommunicado, and to pressure and interrogate him until he confessed.* Although the officers knew any confession thus generated would not be admissible in evidence in a prosecutor's case in chief, they hoped it would be admissible for purposes of impeachment if the suspect ever went to trial. *They expected that the confession would prevent the suspect from testifying he was innocent, and that it would hinder any possible insanity defense.*

*Id.* at 1224 (emphasis added). In accordance with the plan, the police officers ignored Cooper's statement of unwillingness to talk as well as his request to consult with an attorney. *See id.* at 1231.

As in this case, Cooper was not actually tried for the crime for which he was arrested and interrogated, and Cooper sued the police pursuant to § 1983 alleging, *inter alia,* that the defendants' conduct violated the Fourteenth Amendment substantive due process clause under a "shocks the conscience" theory. In concluding that

the police officer's behavior "shocked the conscience," the Ninth Circuit concluded that the "primary aggravating circumstance" was the police officers' "purpose of making it difficult, if not impossible, for a charged suspect to take the stand in his own defense . . . ." *Id.* at 1249. The court explained that the defendants' "purpose was not just to be able to impeach him if he took the stand and lied, but to keep him off the stand altogether." *Id.* The court went on to explain that "[t]he unlawful nature of this aspect of the plan is exacerbated by the plan's second purpose of curtailing an accused suspect's right to present an insanity defense." *Id.* at 1250. Thus, the "shocking" conduct in *Cooper* was not the mere coercion of a confession but, rather, the coercion of a confession pursuant to a conscious and premeditated plan to ignore the suspect's invocation of his Fifth and Sixth Amendment rights so as to compel a confession, which would then hinder the suspect's ability to present a defense at trial. These "aggravating circumstances" noted by the Ninth Circuit in *Cooper* are simply not present here. *See id.* at 1249.

In summary, the manner in which Michael was interrogated does not approach the type of police conduct that has been found in *Rochin* and other cases to be "shocking" in the constitutional sense and to, therefore, violate the Fourteenth Amendment substantive due process clause.

## C. Qualified Immunity: the Second Step of the Analysis

 Even if the court were to determine that defendants' conduct did violate substantive due process, defendants would still be entitled to qualified immunity because it would not have been clear to a reasonable officer that the manner in which Michael's interrogations were conducted amounted to a violation of his Four-

teenth Amendment right to substantive due process given that the interrogations lacked the brutality that has previously marked the police conduct found by the Supreme Court to be "shocking to the conscience." Although Michael contends that it was clearly established in *Rochin* that "[p]olice conduct which 'shocks the conscience' constitutes a violation of substantive due process" and that it was clearly established in *Cooper v. Dupnik* "that obtaining involuntary statements through psychological coercion violated the due process clause of the Fourteenth Amendment," Michael's Opposition at 82:24–28, Michael's reliance on these two cases is unavailing here.

Again, as explained by the Supreme Court most recently in *Brosseau*, in a case such as this, a plaintiff cannot defeat a summary judgment motion on qualified immunity grounds simply by pointing to case law clearly establishing a general proposition such as the proposition that police conduct that shocks the conscience violates substantive due process. *See Brosseau*, — U.S. at ——, 125 S.Ct. at 599; *see also Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. Rather, the inquiry is whether it was *clearly established that it shocks the conscience*, and therefore violates substantive due process, *to interrogate a juvenile in the manner in which Michael was interrogated.* The court concludes that a reasonable officer in defendants' position would not necessarily have known that the police conduct here would meet that standard.

Plaintiffs have failed to identify any relevant case law addressing the issue of when the interrogation of a juvenile crosses the constitutional line and "shocks the conscience" for substantive due process purposes. Nor has the court's attention been directed to any case, other than *Cooper*, involving interrogations in the adult which

was in existence at the time of Michael's interrogation and therefore would have been available to guide defendants' action. As noted, the interrogation in *Cooper* employed different means (blatantly ignoring the defendant's invocation of the right to remain silent and the right to counsel) in order to accomplish different ends (to extract a confession which would keep the defendant off the stand and which preclude the defendant from presenting an insanity defense at trial), and the Ninth Circuit in *Cooper* focused on these means and ends in reaching its conclusion that the police officer's conduct "shocked the conscience." *See Cooper*, 963 F.2d at 1249, 1250 (explaining that the "primary aggravating circumstances" were the defendants' purposes of keeping Cooper from testifying in his own defense and precluding him from presenting an insanity defense and concluding that "[w]hat made these purposes unacceptable" was "the unconstitutional methods chosen to pursue them," which included the disregard of Cooper's invocation of his right to remain silent and his right to counsel). Because the aggravating circumstances in *Cooper* are simply not present here, the facts of *Cooper* would not necessarily put a reasonable officer on notice that the conduct in the present case was so egregious as to "shock the conscience" in a constitutional sense.

Moreover, although *Chavez* had not been decided at the time of Michael's interrogation, even if it had, it would not have clearly established that the manner of Michael's interrogation violated substantive due process. First, it should be noted that four Justices in *Chavez* concluded that the questioning of Martinez, the plaintiff in that case, did not "shock the conscience" despite the fact that (1) Martinez was clearly suffering from physical pain as well as mental anguish at the time;[19] (2) three

19. As noted by Justice Kennedy, Martinez "had been shot in the face, both eyes were injured; he was screaming in pain, and com-

different Justices concluded that the police officer exploited Martinez's pain and suffering "with the purpose and intent of securing an incriminating statement," *Chavez*, 538 U.S. at 797, 123 S.Ct. 1994 (Kennedy, J.); and (3) Justice Stevens characterized the questioning as "brutal" and "the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by tortuous methods." *Chavez*, 538 U.S. at 783–4, 123 S.Ct. 1994 (Stevens, J., concurring in part and dissenting in part). Because the police conduct in the present case was far less egregious than the conduct in *Chavez*, and because four Supreme Court justices in *Chavez* concluded that the conduct in *Chavez* was not shocking to the conscience, one must conclude that, even after *Chavez*, a reasonable officer could believe that the conduct in the present case did not shock the conscience.

### D. Conclusion

Defendants are entitled to summary judgment with respect to Michael Crowe's claim that the manner in which defendants conducted his questioning violated the substantive due process clause of the Fourteenth Amendment under a "shocks the conscience" theory.

### The Crowe Family's Claims

The entire Crowe family brings a claim for violation of the Fourteenth Amendment based on their belief that defendants posted the strip search photographs taken of the family on a widely visible bulletin board in the police station. Assuming, without deciding, that such conduct could support a Fourteenth Amendment claim, this claim must nonetheless fail because the Crowes have failed to come forth with evidence from which a factfinder could find that pictures of the Crowes were in fact posted on a bulletin board in the police station. The only evidence that plaintiffs have presented is that they saw pictures similar to theirs posted and, therefore, they assumed that theirs were posted at some point. Such assumptions are not sufficient to support the denial of defendants' motion, and the motion is granted with respect to this claim.

In addition, it appears that Cheryl and Stephen [20] are bringing a claim based upon the drawing of a gun in their presence after they attempted to leave the police station through a secured door. Taking the evidence in the light most favorable to plaintiffs, as Stephen was about to open the door, a large number of police officers, including defendant Wrisley, appeared. Defendant Wrisley had his gun drawn and pointed at Stephen, and Wrisley yelled at Stephen "This is a secure area. Get back upstairs. Now." Omnibus Decl. of Stephen Crowe ¶ 20 (Exhibit 44, Michael's Exhibits). The other officers had their hands on their guns but did not have them drawn. *Id.*

 Factors to consider in evaluating a substantive due process excessive force claim include the need for force, the amount of force used, the extent of injury inflicted, and whether force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Carr v. Tatangelo*, 338 F.3d 1259, 1271 (11th Cir.2003). An officer is entitled to qualified immunity if, considering these factors, a reasonable officer could have believed that the use of force under the circumstances was lawful. *See id.*

---

ing in and out of consciousness while being repeatedly questioned ...." *Chavez*, 538 U.S. at 798, 123 S.Ct. 1994

**20.** Neither the Shannon, Michael, nor Judith Kennedy were present during this alleged incident. Therefore, they cannot bring a claim arising out of this incident.

Here, although it is somewhat questionable whether defendant Wrisley needed to draw his gun, no actual force was used, and no injury was inflicted. Moreover, it appears that the force was applied in an effort to maintain security and not for the purpose of causing harm. Under these facts, defendant Wrisley's conduct toward Cheryl and Stephen is not shocking in the constitutional sense.

Moreover, even if defendant Wrisley did violate Cheryl and Stephen's substantive due process rights, plaintiffs have failed to cite any case law suggesting that the threatened use of force under these facts violates the Fourteenth Amendment substantive due process clause, and such a violation is not obvious. Thus, a reasonable officer could have believed that the minimal use of force employed by defendant Wrisley was lawful.

Accordingly, to the extent that Cheryl and Stephen are raising such a claim, defendants' motion for summary judgment is granted as to it.

## V. Fifth Claim for Relief—Fourteenth Amendment Substantive Due Process (Deprivation of Familial Companionship)

### Arising Out of Michael's Arrest

A substantive due process claim for deprivation of the right to familial companionship is recognized where the deprivation is the result of "unwarranted" governmental interference. *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers–Durgin v. de la Vina*, 199 F.3d 1037 (1999). As discussed *supra*, Michael's arrest was supported by probable cause. Thus, the state's interference with the Crowes' familial relationship as the result of Michael's arrest was not "unwarranted." *See Schaefer v. Goch*, 153 F.3d 793, 799 (7th Cir.1998) ("Because we have concluded that Sergeant Goch did not violate Kathy Nislowski's rights under the Constitution, her parents' claims based on the loss of her society and companionship necessarily fail as well."). Thus defendants are entitled to summary judgment with respect to this claim.

Moreover, as detailed in § II.D, *supra*, even if it were determined that Michael's arrest was not supported by probable cause, a reasonable officer could have believed that it was supported by probable cause. Therefore, defendants would be entitled to qualified immunity under the second prong of the *Saucier* test because a reasonable officer could have believed that Michael's arrest constituted a warranted interference with the right of companionship.

Accordingly, defendants are entitled to summary judgment with respect to this claim.

### Arising Out of Michael's and Shannon's Placement in Protective Custody

Defendants also seek summary judgment to the extent this Fourteenth Amendment claim is predicated upon the placement of Michael and Shannon in protective custody at the Polinsky Children's Center prior to Michael's arrest. Defendants contend that the interference with companionship was warranted pursuant to California's Welfare and Institutions Code § 305(a), which provides that a police officer may, without a warrant, take a child into temporary custody "[w]hen the officer has reasonable cause for believing that the minor is a person described in Section 300, and, in addition, that the minor has an immediate need for medical care, or the minor is in immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety." Defendants have failed to demonstrate that the place-

ment of Michael and Shannon at the Polinsky Children's Center was warranted under this provision.

First, defendants have failed to demonstrate that there was reasonable cause for believing that Michael or Shannon were in immediate danger of physical abuse. Moreover, defendants have failed to demonstrate that there was reasonable cause for believing that they were minors within the meaning of § 300, as there was not reasonable cause for believing that there was "a substantial risk that the child will suffer[ ] serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Wel. & Inst. Code § 300(a). Moreover, there was no basis for concluding that Cheryl and Stephen Crowe caused Stephanie's death through abuse or neglect. *See* Cal. Welf. & Inst.Code § 300(f).

Moreover, on these facts, no reasonable police officer could have believed there was reasonable cause for Michael's and Shannon's placement in protective custody. Accordingly, defendant's motion is denied with respect to this claim.

### VII. Ninth Claim for Relief—False Arrest/False Imprisonment
#### Michael's Claim

■■ Defendants seek summary judgment on Michael's claim for false arrest/false imprisonment. Under California law, no cause of action may be brought against a police officer for false arrest or false imprisonment arising out of any arrest when "[t]he arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful." California Penal Code § 847(b)(1). Penal Code § 836(a)(3) provides that a warrantless arrest is lawful when a police officer has "probable cause to believe that the person to be arrested has committed a felony, whether or not a felony, in fact, has been committed." As is

the case with federal law, California law provides that "the court must look to the facts known to the peace officer at the time of the arrest" in determining whether there is probable cause for a warrantless arrest. *Giannis v. City and County of San Francisco*, 78 Cal.App.3d 219, 224, 144 Cal.Rptr. 145 (1978). "The issue of whether an arrest was made with reasonable cause is an issue of law to be decided by the court." *Id.* at 225, 144 Cal.Rptr. 145.

For the reasons set forth in section § II.D, *supra*, defendants had reasonable cause to believe that Michael's arrest was lawful. Therefore, California Penal Code § 847 shields defendants from liability for Michael's arrest. Accordingly, defendants are entitled to summary judgment with respect to Michael's claim for false arrest/false imprisonment.

### VI. Eleventh and Twelfth Claims for Relief—Intentional and Negligent Infliction of Emotional Distress
#### All Plaintiffs

Defendants seek summary judgment with respect to the claims of Michael and the rest of the Crowe family for intentional and negligent infliction of emotional distress. It is impossible from a review of the complaint to determine upon which acts of defendants these claims are predicated. Moreover, in their oppositions, neither Michael nor the rest of the Crowe family illuminates the basis of their claims and neither sets forth arguments explaining how the evidence presented is sufficient to withstand a motion for summary judgment directed at these claims. Accordingly, the court finds that Michael and the rest of the Crowe family have failed to meet their summary judgment burden, and defendants' motion is granted with respect to these claims.

## CONCLUSION

In the ensuing years, since that fateful and tragic night in January of 1998, there has been a fundamental change in the law, a change that affected the outcome of these motions. As this court noted in its previous order, "[a]t the time of the boys' interrogations, Ninth Circuit case law held that a Fifth Amendment violation occurs at the moment police officers coerce a confession from a suspect." *Crowe*, 303 F.Supp.2d at 1086. However, after *Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), "it is clear that a § 1983 plaintiff cannot succeed on a Fifth Amendment self-incrimination claims predicated solely upon coercive police interrogation resulting in an involuntary confession." *Crowe*, 303 F.Supp.2d at 1098. Rather, in order for Michael to have a viable Fifth Amendment claim against defendants, Michael must demonstrate that his coerced statements were used against him in a criminal trial, which he is unable to do. This sea change in the law undermined and brought to naught the Fifth Amendment self-incrimination claims of Michael and the other boys, which claims were originally, in many ways, the heart of this lawsuit. It is because of this change in the law that the motion for summary judgment is granted as to Michael's Fifth Amendment self-incrimination claim.

As for Michael's substantive due process claim, although defendants should not be proud of their conduct, defendants' conduct did not rise to the level of being shocking to the conscience in the constitutional sense. Accordingly, the motion for summary judgment is granted as to Michael's substantive due process claim.

As for Michael's Fourth Amendment claim arising out of his arrest, while the conviction of Tuite for Stephanie's homicide might appear, to those unversed in the law, to lend credence to plaintiffs' arguments that Michael's arrest was not sup-ported by probable cause, Tuite's conviction, which occurred many years after the murder and Michael's arrest, does not, under the law, affect the determination as to whether Michael's Fourth Amendment rights were violated in 1998. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865 ("The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested ...."). The issue is whether there was probable cause to arrest Michael, which requires consideration of the facts that defendants had in their possession at the time of Michael's arrest. *See Beck*, 379 U.S. at 96, 85 S.Ct. 223. Because there was probable cause to arrest Michael given the facts in defendants' possession at that time, the motion for summary judgment is granted with respect to this claim. Moreover, because there was probable cause to arrest Michael, the motion for summary judgment is granted with respect to Michael's claim for false arrest/false imprisonment.

As for the Crowes' Fourth Amendment claims arising out of the strip searches, the motion is granted as to Michael's claim but denied as to the claims brought by the rest of the family. Similarly, the motion for summary judgment is granted with respect to Michael's Fourth Amendment claim based on the seizure of his hair and blood, but denied with respect to Cheryl and Stephen's Fourth Amendment claim based on the seizure of their hair and blood.

The motion for summary judgment is granted with respect to the Crowes' Fourth Amendment claim arising out of the search of their residence.

The motion for summary judgment is denied as to the Cheryl and Stephen's Fourth Amendment claim arising out of their detention at the police station.

The motion for summary judgment is granted as to the Crowe family's Fourteenth Amendment substantive due process claims based upon the posting of photographs, as there is no evidence that the photographs were posted. The motion for summary judgment is also granted as to Cheryl and Stephen's Fourteenth Amendment substantive due process claims based upon the pointing of a gun at Stephen.

The motion for summary judgment is denied as to the substantive due process claim for deprivation of familial companionship arising out of Michael and Shannon's placement in protective custody but is granted to the extent that claim arises out of Michael's arrest.

In addition, the motion for summary judgment is granted as to the state law claims for intentional and negligent infliction of emotional distress.

Finally, although one could certainly criticize the manner in which the investigation of Stephanie's murder was conducted, it must be remembered that the *sine qua non* of a § 1983 action is whether there has been a constitutional violation. It is not enough that the police may have been heavy-handed, mendacious and unprofessional. *Cf. Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). The acts of the police officers must be found to be in violation of the Constitution. While the court may not approve and condone the methods that the police employed, the court's personal predilections are necessarily irrelevant in a constitutional analysis.

**IT IS SO ORDERED.**